25 So.2d 685

## FLANIGAN v. STATE.

### 8 Div. 314.

Supreme Court of Alabama.

March 28, 1946.

Rehearing Denied April 25, 1946.

Arthur L. Shaw and Jas. Smith, Jr., both of Tuscumbia, for appellant.

Wm. N. McQueen, Atty. Gen., and John O. Harris, Asst. Atty. Gen., for the State.

BROWN, Justice.

The appellant R. Ben Flanigan, to whom we will hereafter refer as the defendant, was indicted, tried and convicted of murder in the first degree and sentenced to death by electrocution. On being arraigned the defendant pleaded "not guilty" and "not guilty by reason of insanity." Thereafter by leave of the court he withdrew his pleas and filed a demurrer to the indictment which contained three counts, but inasmuch as counts two and three were nolle prossed, and the trial proceeded only on count one, we will limit our consideration to that count, in treating the demurrer filed thereto on the single ground, "That the caption of the indictment does not contain the legal requirements."

On the authority of Reeves v. State, 20 Ala. 33, and Goodloe v. State, 60 Ala. 93, it is insisted that the caption of the indictment should show who presided as judge, the venire and who were summoned and sworn as grand jurors. The record here is captioned as required by Rules 26 and 27 of Supreme Court Practice. Code 1940, Tit. 7, Appendix, pp. 1013, 1015, and § 380, Tit. 15, Code 1940. The indictment itself contains the following caption:

"The State of Alabama, Morgan County. } Circuit Court February Term, 1945."

Said count one is in the following words: "The Grand Jury of said county charge

that before the finding of this indictment R. Ben Flanigan, whose name is to the Grand Jury otherwise unknown, unlawfully, and with malice aforethought, killed Lee Shafer, by shooting him with a gun or pistol, against the peace and dignity of the State of Alabama."

In Reeves v. State, 20 Ala. 33, the caption of the indictment and the charging part thereof was substantially the same as the indictment here and the conviction in that case was sustained and the judgment of the circuit court affirmed on appeal. In concluding the opinion Chief Justice Dargan observed:

"Nor is it necessary that the name of the county should be repeated, in that part of the indictment where the pleader has inserted by mistake Buter for Butler. But in framing an indictment, after stating the name of the county in the margin, it is sufficient to say, 'the grand jurors *on their oath present,*' &c., leaving out that portion which we usually find inserted, 'of the State of Alabama, empannelled, sworn, and charged to inquire for the body of —— county.' *The caption of an indictment is that entry of record showing when and where the court is held, who presided · as judge, the venire, and who were summoned and sworn as grand jurors; and this caption is applicable to, or is a part of every indictment, and need not be again repeated in any part of the indictment.* The State v. Murphy, 9 Port. 487; * * *. But after stating in the margin the name of the State and the county, the pleader may at once proceed: 'the grand jurors on their oath present,' &c., and a reference to the caption will show when, where, and under what authority the presentment was made." [Italics supplied.]

The trial in that case was in the court and county wherein the indictment was preferred.

It seems reasonably clear that the learned Chief Justice by the italicized utterances had reference to the caption of the record, the organization of the court for the term in which the indictment was preferred—which is essential, as showing jurisdiction of the trial court. This conclusion is supported by the opinion in Goodloe v. State, 60 Ala. 93 [95], wherein it was observed:

"Following the lead of the cases cited above, we feel it our duty to regard the question as settled in this State, that a caption, such as is described in Reeves v. State, supra, is an essential of a good indictment; and when the question comes before us on appeal *if the record* does not contain such caption, it is a fatal error. If it were an open question in this State, it might admit of serious doubt if this doctrine did not have its origin in certiorari proceedings from courts of limited, inferior jurisdiction; and that it should not be applied to records from courts of general jurisdiction. * * *" [Italics supplied.]

In the Goodloe case the indictment was preferred by a grand jury impaneled in the Circuit Court of Franklin County at the fall term, 1868. He was tried at the fall term of 1877, in the Circuit Court of Colbert County and was convicted and sentenced to the penitentiary for a term of five years. While there was an agreement of some sort about the transfer of cases to the Colbert Circuit Court, there was no schedule of the docket of said cases contained in the record. Nor was there any showing as to what cases were embraced in the agreement. The record of that appeal did not show an organization of the grand jury. Otherwise stated, the record did not show that the Circuit Court of Colbert County had jurisdiction of the defendant and his case. This court, after quoting from the latter part of the opinion in Reeves v. State, in reference to the caption, reversed the judgment of conviction for the reason that, *"The record in the present case fails to show a legal transfer to Colbert County,* and, therefore, fails to show any jurisdiction in the court to try the offender." 60 Ala. 93, 96. [Italics supplied.]

In Williams v. State, 171 Ala. 56, 54 So. 535, 536, the indictment was preferred by a grand jury organized in the Circuit Court of Covington County. The defendant was tried and convicted in the Andalusia City Court and from the judgment of conviction he appealed. The judgment was reversed on the ground that there was a noncompliance with the statute creating the city court which provided:

" 'At the next regular term of the circuit court for said county, and on the first day thereof, it shall be the duty of the presiding judge thereof to make and enter upon the minutes of said court an order directing the clerk of such court to deliver to the judge of the city court all indictments in misdemeanor cases then pending and undetermined in said court, and said order shall provide for the delivery of all other indictments in misdemeanor cases which

may hereafter be found by any grand jury of said court, or that may be pending therein, together with all the papers, data, *and a copy of the records of such indictments and the minute entries therein,* and upon such delivery the jurisdiction of the circuit court shall cease, and the said city court be empowered to try all such causes as if the same had originated in said city court,' etc."

The court further observed: "The transcript of the record certified in this case contains what purports to be a copy of *the organization of the term of the circuit court at which,* and of the grand jury by which, the indictment was preferred against the defendant. But the certificate authenticates the record of the city court as it was on the 12th day of January, 1911. The trial was had on September 1, 1910." [Italics supplied.]

The offense for which Reeves was indicted in Reeves v. State, supra, was committed in the year 1850, and he was tried in January, 1852, before the adoption of the Code of 1852, § 3501 of which prescribed the form and substance of indictments as follows:

"§ 3501. The indictment must contain:

"1. The name of this state, the county, court, and term in which it is preferred.

"2. A statement of the facts constituting the offence, in ordinary and concise language, without prolixity or repetition; and in such a manner as to enable a person of common understanding to know what is intended; and in no case are the words 'force and arms,' or 'contrary to the form of the statute,' necessary."

Section 3502, Code 1852 provides:

"It may be substantially in the following form:

"The state of Alabama, County. } Circuit Court Term, 185—.' "

These sections have been brought forward through the several codes since that time and Section 5601 is now § 229, Tit. 15, Code 1940, which prescribed the "caption and substance of the indictment."

Section 259, Title 15, Code 1940, provides:

"The following form of indictment, in all cases in which they are applicable, or sufficient; and analogous forms may be used in other cases.

"1. (1) (1) Caption, commencement, and conclusion.

"The State of Alabama, } Circuit court, ——— session, 19———.

"The grand jury of said county charge that, before the finding of this indictment, etc. *(describing the offense as in the following forms),* against the peace and dignity of the State of Alabama. * * *"

Sections 278 and 285, Tit. 15, Code 1940, provide:

"§ 278. No objection to an indictment on any ground going to the formation of the grand jury which found the same can be taken to the indictment, except by plea in abatement to the indictment; and no objection can be taken to an indictment by plea in abatement except upon the ground that the grand jurors who found the indictment were not drawn by the officer designated by law to draw the same; and neither this objection, nor any other, can be taken to the formation of a special grand jury summoned by the direction of the court."

"§ 285. No objection can be taken to an indictment, by plea in abatement or otherwise, on the ground that any member of the grand jury was not legally qualified, or that the grand jurors were not legally drawn or summoned, or on any other ground going to the formation of the grand jury, except that the jurors were not drawn in the presence of the officers designated by law; and neither this objection nor any other can be taken to the formation of a special grand jury summoned by the direction of the court."

Our decisions are clear to the effect that the limitation in §§ 278 and 285, the causes specified, and the method of presenting objection, is the only method for raising such questions. Rogers v. State, 144 Ala. 32, 40 So. 572; Doss v. State, 220 Ala. 30, 123 So. 231, 68 A.L.R. 712. By the rules of court cited and the enactment of the cited statutes, it is clear that, their intent was to obviate the necessity of setting out in the record on appeal the organization of the court, the venire, and the organization of the grand jury, unless the sufficiency of the indictment was questioned as provided in said §§ 278 and 285.

The demurrer in the instant case was too general to require the court to examine the indictment further than to see

that it had the statutory caption. The demurrer was, therefore, overruled without error. Turk v. State, 140 Ala. 110, 37 So. 234; Reeves v. State, 20 Ala. 33; James v. State, 53 Ala. 380; Doss v. State, supra.

The state offered evidence going to show that the deceased Lee Shafer while on his way to work in the early morning of December 9, 1944, was waylaid by two men on a public street or highway in the City of Decatur, Morgan County, Alabama, was shot and robbed of his wallet, containing a considerable amount of money, which he habitually carried on his person. That immediately after the shot was heard two men, afterwards identified as defendant and Almon Stutts, ran away from the scene. The evidence shows that the bullet passed through Shafer's right leg, severed the femoral artery, and then passed through or lodged in the other leg, and that the wound in the right leg caused his death from loss of blood. The evidence further shows that he was hit over the head and his skull fractured.

Annie May Woliver was sworn and put on the stand by the state and testified that the defendant came to the house where she and Stutts lived before daylight on Saturday morning; that Stutts and Flanigan took a drink of whiskey and left, that later in the morning Mrs. Flanigan, the wife of defendant, came to the house of witness and told her Stutts had called and said for her and Mrs. Flanigan to come to the small town of Leighton, Alabama; that the car was broken down; that they road a bus to Leighton where they joined Flanigan and Stutts; that she saw the defendant hand his wife a roll of money and told her it was $100 and to put it in her pocket book and keep it, that they drove to Tuscumbia and went to Kelley's garage. Over the objection with an exception reserved this witness testified that defendant said he would give $200 if he could get his car fixed that day; that Mrs. Flanigan told Stutts and Flanigan a man was killed up around Ingall's Iron Yards, and this witness testified that she did not hear Stutts make a statement that he did not think so, "that he seldom missed," that he "thought he missed that time," and when pressed on cross examination she stated she could not say exactly which one made the statement about seldom missing, but never said that defendant made the statement; that witness and Stutts together returned to Decatur in the afternoon and that defendant and his wife also returned to Decatur.

The state offered evidence showing that Flanigan after his arrest and while in jail made a confession in the presence of the police officers who had been investigating the crime and, after laying a predicate showing that the confession was voluntary, free from the influence of threats, abuse, promise of reward or the hope thereof, said confession, reduced to writing by one of the officers and signed by the defendant, was offered by the state and admitted in evidence, and is in the following words and figures:

"I make this statement of my own free will and accord, without any promises being made to me by anyone.

"We, Almon Stutts, Odie Conner, a heavy man * * *

"Mr. Smith: We object to that part; it is not a part of the res gestae, something that happened the night before.

"The Court: Overrule the objection.

"Mr. Smith, We except.

'a heavy man, Straw Warren and his boy was at Straw's house on West Market Street gambling and drinking. We left there, went to Hillsboro to buy some whiskey, and didn't get any, and carried Odie Conner home between 10 P.M. and 12 P.M. on Friday night, December 8, 1944. Then we (I mean Straw Warren's boy) carried Almon Stutts home. Me and the Warren boy came back to bus station. Warren put $1.00 worth of nickels in Rocola. Then I went home and went to bed about 11:30 P.M., Friday night. I set the clock at 5:30 A.M. then went over to Stutts' house on 10th Avenue East and got him out of the bed, and then we went back to Straw Warren's and bought a half pint (he didn't say what). Almon paid for it, paid $1.50 and owes Straw one more dollar. I drove around by shipyard, came back by service station at edge of town which was on my right coming back—I think it was Campbell's Station—turned to my left up to next street, still going east and turned to my left on next street, it was the street between the highway and Market Street, went to next street, turned to left, went over the high sidewalk and parked on the right side of the street. We both walked back up the sidewalk and stepped off in patch on my right about 12 feet when we saw him come out of house. Stutts went

in patch with me. Stutts knew what time he went to work and Stutts told me about him having all this money. Stutts said he carried a roll. Stutts told me that night before if I would come over there and get him we will take it. As the man got even with us Almon stepped out and halted him with a gun. The man started running. Almon started running after him and one gun fired. The man fell and hollered. Almon hit him over the head with the butt of the gun. He fell over and didn't say no more. Then we ran to the car. I didn't do nothing. He (Almon) took the pocket book out of the man's pocket himself. We got to the car about the same time. Almon wasn't so drunk. I was drinking too. Almon stuck the gun under his belt. We went down Courtland road to George Hames' house on old Hillsboro road and woke him up to try to fix the clutch on the car. Almon was sitting inside of car at George's house and divided the money into two piles, and there was $140.00 in each pile. He gave me one and he took the other. George walked around to side of car and said, 'God damn, what a pile of money.' We went on to Leighton and saw my brother. When I was having my car worked on we came on back to highway and my brother was going home and stopped there, and I got out and talked to him. I told Stutts to hand me that gun, I was going to get my brother to carry the gun on out to the house. Stutts got the gun and handed it to me and I gave it to my brother. The gun that the police have and showed me is the gun that we had and the gun we carried to my brother to put away for us. I got the gun, a 45 blue steel Colts with 6-inch barrel from DeLoyd Degrath when he went to the Merchant Marines about three months ago. We did go on railroad track behind some box cars about 7:30 A.M. Saturday morning, December 9, 1944 and changed shirts and I put on another pair of pants. We put clothes there in the vines on fence row. I called my brother from Leighton and we went back home with him Sunday evening. We drove by Courtland where we had left the clothes Saturday morning. I got the clothes, went across the lot and wrapped them around a can and threw them in the creek out about middle of the creek. They were floating down the creek the last time I saw them. We went to Tuscumbia, came back home Saturday night on Tennessean and got home about 12:30 A.M. Sunday morning.

I gave my wife $80.00 of that money that we got off dead man. I have heard this read and it is true. The police have treated me nice and wrote just what I said.

"R. B. Flanigan.

"Witnesses:

"J. B. Whitmire,

"Alex Terry,

"W. C. Hunter."

The testimony constituting the predicate for the introduction of this confession was given by the officers who heard and took down the confession, and witnessed the same, in the sheriff's office at the county jail. On cross examination, the witness Whitmire testified that he was armed with a pistol and blackjack and he assumed that the other police officers who were dressed in their uniforms were also armed, but these arms were concealed and not displayed or used to induce defendant to confess. The defendant's objection to the admission of this confession was overruled without error. McAdams v. State, 216 Ala. 659, 114 So. 39; Spicer v. State, 69 Ala. 159.

The defendant also objected to the statement in the confession: "We, Almon Stutts and Odie Conner, a heavy man," on the ground that it was not of the res gestae of the crime; was something that happened the night before. This objection was properly overruled. Before the confession was offered, evidence had been adduced tending to show that defendant and Stutts in pursuance of a conspiracy had robbed and killed Shafer, and the details of their movements the night before the killing and on the morning of the killing and their concerted movements after the killing, which tended to corroborate the confession, were properly admitted in evidence, although not part of the res gestae. Pilley v. State, ante, p. 263, 25 So.2d 57; Miller v. State, 130 Ala. 1, 30 So. 379; Hall v. State, ante, p. 523, 24 So.2d 20.

It was permissible, and the court without error allowed the state to show, that the deceased worked at the Ingall's Shipbuilding Company yards; that he had recently, before the murder, been paid off, and that he habitually carried money on his person and the approximate amount thereof, and that on Friday before the killing on Saturday, he drew a check for back pay.

The ruling of the court permitting the witness Mrs. Ollie Shafer to tes-

tify that she delivered deceased's hat and coat to Mr. Brooks, the Toxicologist, was free from error. It was also permissible for the state to show by the witness Brooks, after stating his knowledge and experience touching such matters, that he examined the pistol, the pistol ball, delivered to him by officer Whitmire, and that he examined for blood stains, found blood stains; that he fired the pistol and compared the same with the pistol ball delivered to him by the officer and which had been previously identified by the defendant as the ball fired from the gun on the morning of the murder; that he found hair on the coat of the deceased and compared it with the hair found on the gun, and these hairs bore resemblance to each other.

The court did not err in admitting in evidence the statement of the officer investigating the crime that he searched the creek where defendant's confession indicated he had thrown the clothes which he and Stutts took off near Courtland and found them in the creek tied around or stuffed in an old can or bucket. Nor was there any error in overruling the defendant's objection to the argument of the prosecuting attorney in respect to the amount of money which the deceased carried on his person near the time of the homicide. This was legitimate within the testimony in the case and its reasonable inferences.

The defendant offered no evidence.

Defendant's special written charge 9 was refused without error because of the use of the word "client" for defendant, and for the reason that it was abstract. There is no evidence showing that defendant at the time of the homicide was so intoxicated that he could not form a criminal intent.

Charge 13 was refused without error for like reason.

Charge 21 is argumentative.

Charge 23, the affirmative charge, was well refused.

Charge 26 relating to the plea of "not guilty by reason of insanity" was refused without error, that plea having been withdrawn.

Charges 31 and 32 ignore the undisputed fact that defendant was present, aiding and abetting Stutts, at the time he shot and killed the deceased.

Charges predicated on counts 2 and 3 were well refused. Those counts were nolle prossed.

The defendant's motion for a new trial is mainly rested upon three grounds. 1. That the jurors, after they were impaneled and sworn and the trial entered upon, were allowed to separate and sleep in different rooms at the hotel. 2. That the juror Hyatt sat in the court room among the audience attending the trial and saw the witness Woliver who testified for the state, who had her head bandaged, and heard some remarks in respect thereto. According to defendant's theory, defendant's wife had beat her up because of her testimony given on the trial of the case. 3. That on the first day of the defendant's trial, while the jury was being selected or just before it was sworn, the whistles at the several industrial plants were sounded in concert for five minutes.

The evidence shows that on the night of the first day of the trial, March 5, 1945, the jury in charge of a deputy sheriff was housed on the third floor of the Cornelian Court Hotel in the City of Decatur, occupied four rooms, two of said rooms being on one side of the hall and two on the other. That the jurors slept in these rooms, retiring between ten and eleven o'clock and the deputy sheriff and two of the jurors occupied the same room. During the early part of the evening the jurors played games such as rook and other games, probably five-up, and the only person who had any contact with any of the jurors was the deputy sheriff and a servant who brought ice water on one occasion. No one was seen during the evening or at any time while the jury was occupying these rooms on the floor except a soldier and his wife, who occupied a room thereon, and they were seen to pass down the hall.

The evidence, on hearing of the motion for new trial, shows that neither the jurors nor the officer in charge of the jury, was guilty of misconduct, and the testimony without dispute negatives the fact that the case was at any time referred to or discussed between jurors. The only separation was when the jurors retired and locked the rooms in which they were sleeping.

The arrangements for the housing of the jury were made by the deputy sheriff in charge of the jury, who is not shown to have had any interest in the case or in any way participated in its prosecution,

either for the state or the defendant. The deputy sheriff testified that he made arrangements at this hotel for housing the jury; that the rooms in which the jurors were housed was the only space obtainable in the City of Decatur for their use; that he, the deputy, registered the names of the jurors on the hotel register, and that the only calls over the telephone were made by the deputy to obtain cards for the use of the jurors in passing the time in the early part of the evening.

The testimony of juror Hyatt, though it was somewhat confusing, goes to show that the only time he separated from the jury and sat in the audience was after the jury had made their verdict and returned into court and been discharged. That he was waiting for his friend who had accompanied him from his home to court, some twenty-five or thirty miles from Decatur, and who was out on another jury in another case.

The law is well settled that if the jury or any member thereof are guilty of misconduct and through such misconduct, or through the agency of the parties or persons interested in the case on trial, come in contact with vitiating influences, the law will make no inquiry whether or not such influences affected their verdict, and on motion, a new trial will be ordered. Louisville & N. R. Co. v. Turney, 183 Ala. 398, 62 So. 885; Oliver v. State, 232 Ala. 5, 166 So. 615, 617. But where no such misconduct is shown, and where no contaminating influences have touched the jury, though there be a technical separation, if the evidence taken on the motion rebuts the presumption of prejudice, the court will not be reversed for refusing new trial. Payne v. State, 226 Ala. 69, 145 So. 650; Arnett v. State, 225 Ala. 8, 141 So. 699; Davis v. State, 240 Ala. 365, 199 So. 547.

The jurors impaneled to try defendant, aside from one, lived in the country some fifteen to forty miles from Decatur, and while some of the jurors testified (all being examined by the court and the parties), that while they heard the whistles blowing, it made no impression on them. Some thought probably there was a fire in town, and others testified that they didn't notice the whistles.

After due consideration of the testimony given ore tenus on the hearing of the motion for a new trial, we are not willing to disturb the conclusion of the trial court that the matters and things set up in the motion worked no prejudice to the defendant.

The evidence offered by the state shows without dispute that defendant and Stutts waylaid and in an attempt to rob Shafer, Stutts shot him, with a pistol furnished by the defendant and caused his death. Also that Stutts hit the deceased over the head with the pistol, crushed his skull and then robbed him of his wallet containing money. There is not a mitigating circumstance in favor of the defendant. He went to the house of Stutts and woke him up, supplied the conveyance to take him to the place of the holdup, furnished the pistol used by Stutts to kill Shafer, then left Shafer in the throes of death and the scene of the crime in defendant's automobile, and afterwards they divided the spoils.

The record presents a case of cruel and dastardly murder committed in accomplishing highway robbery.

The motion for new trial was properly overruled.

We have examined all the rulings of the trial court adverse to the defendant, some of which are not insisted upon as error, and we find no error in the record. The judgment and sentence, therefore, are due to be affirmed and it is so ordered by the court.

Affirmed.

All the Justices concur.