43 So.2d 831

## FITZHUGH v. STATE.

### 6 Div. 782.

Court of Appeals of Alabama.
June 21, 1949.

Rehearing Denied July 19, 1949.

Ray & Giles, of Birmingham, for appellant.

A. A. Carmichael, Atty. Gen., and L. E. Barton, Asst. Atty. Gen., for the State.

HARWOOD, Judge.

This appellant was tried on an indictment charging her with murder in the first degree. The victim was appellant's 34 months old son, who died as a result of strangulation. At the trial below she interposed pleas of not guilty, and not guilty

by reason of insanity. The jury returned a verdict of guilty of manslaughter in the first degree, and fixed appellant's punishment at imprisonment in the penitentiary for a term of ten years.

Two days after the indictment in this case was returned one of the judges of the Tenth Judicial Circuit appointed three Birmingham mental specialists of outstanding reputation to examine appellant to determine her mental condition.

The pertinent portions of the report of the psychiatric examination of these three mental specialists are as follows:

"First, we do not find Mrs. Fitzhugh presenting any clear cut mental disorder which can be positively diagnosed and classified.

"Second, from all of the data at hand we do suspect very strongly that she does represent what might be called a latent case, or undeveloped case, of schizophrenia or dementia praecox; which is a rather common form of mental disorder leading to bizarre and unexplainable behavior.

"Third, in view of the fact that we cannot make a positive diagnosis of a mental disorder, and that we cannot come out clearly and state that she is definitely normal, and in view of the further impression that she can quite well be considered a latent schizophrenic, we suggest serious consideration be given to our suggestion that she be committed to Bryce Hospital for a period of observation and study long enough to determine definitely, as near as it is possible, whether she has, or is developing, or will develop later, this suspected mental condition."

Upon receiving this report the appellant was ordered sent to the Bryce Hospital for further observation by a lunacy commission. Appellant was received in the Bryce Hospital on April 2, 1948. After study and observation the Lunacy Commission, composed of Dr. W. D. Partlow, Superintendent of the Alabama Hospitals, and Drs. J. S. Tarwater and S. H. Darden, Staff members of the Bryce Hospital, forwarded their report to the court on September 9, 1948. The pertinent portions of this report are as follows:

"It is the opinion of each of us, and our opinion jointly and collectively, that the said Dorothy Ruth Fitzhugh at the time of her admission to the Bryce Hospital on April 2, 1948 was sane and competent but showed a memory defect (defective reproduction) of an event occurring on the night of January 12, 1948 or the night during which the death of her child occurred. This event being the death of her three year old child with circumstances pointing strongly to her as the one causing the death. Associated with this defective reproduction of memory of the event, there was inappropriate emotional tone giving the impression of indifference to the death of her child to which she had always been very attentive and protective. It is our opinion that Dorothy Ruth Fitzhugh ever since the date of her admission to The Bryce Hospital has been sane and competent but continued to show evidence of this memory defect associated with inappropriate emotion.

"Laboratory and diagnostic studies including X-Ray of skull, electroencephalogram, and spinal fluid studies fail to reveal evidence of organic brain disease as cause of a defective memory for events occurring on the night of the death of her child.

"Personality study and history supplied by the husband and parent indicate that Dorothy Ruth Fitzhugh is a woman with a neurotic or frustrated personality, that she grew up as a lonely, detached and unloved child and with her marital life being unhappy and once marred by divorce from her present husband who has never been able to emancipate himself from his mother and home; that about three years ago during a moody episode, she considered death and snapped a loaded revolver aimed at her head; that she was under severe stress for several months prior to the death of her child because of debts incurred because of her borrowing money without the knowledge of her husband to run the house and that considerable pressure was being made on her for payment of these debts; that on the night of the death of her child prior to retiring to bed, she bumped her head sufficiently severe to cause a headache.

"It is the opinion of this commission that while Dorothy Ruth Fitzhugh is at present

sane and competent, she on the night of January 12, 1948 or the night of the death of her child was in a hysterical somnambulistic state and not sanely aware of her acts and that she was insane and incompetent at the time."

After receipt of the above report the appellant was returned to Jefferson County for trial.

The evidence presented by the State in the trial below was directed toward showing that appellant, her husband, Alex Fitzhugh, and their two children, John Warren, the victim, and Ruth Adelaide, some 4 or 5 months of age at the time of this tragedy, lived in a garage apartment located in the rear of the home of appellant's mother-in-law, Mrs. Bertha F. Fitzhugh.

Alex Fitzhugh, the husband of appellant and father of the victim, was working on a night shift and had left for work around 10 P.M.

Shortly after midnight, screams were heard by members of Mrs. Bertha Fitzhugh's household, and appellant came to Mrs. Fitzhugh's back porch. She was carrying her son, John Warren wrapped in a blanket. As she was admitted to the house she handed the child to her sister-in-law, Rose Mary Fitzhugh, saying "Take him Rosy, he is dead."

Her mother-in-law took the child from Rose Mary Fitzhugh and laid him on a bed. She was unable to find any pulse or heart beat, and discovered a red mark or band about an inch wide around the child's neck.

During this time appellant was sobbing and distraught, and made some reference to an intruder.

An ambulance was summoned, as well as appellant's husband and the police.

Mr. W. J. Haley, a detective for the City of Birmingham, arrived at the Fitzhugh home about 1:30 A.M. Other officers had preceded him there. Mr. Haley, during his investigation at the Fitzhugh home talked to the appellant. After the voluntary character of appellant's statement had been established Mr. Haley was permitted to give, over appellant's objection, her account of what had occurred. In this connection Mr. Haley testified as follows:

"A. She said that she had waked up, that she had been asleep and that she had waked up and flashed a light over on the baby's bed.

"Q. Now, you refer to the 'baby's'— A. Johnnie, I believe, is—

"Q. All right, sir. A. —that is the boy's bed, and she said the baby girl was in the bed with her, and that she flashed a light on Johnnie's crib, and that he was not—he was not in it, and she got up out of her bed and went into the front room and she saw Johnnie laying on the blanket in front of the davenette, and she said that the room was in disorder, it was tumbled, the drawers were pulled out of the desk, and that the front door was standing open and the lights were off; and she said she grabbed the baby and ran down to her mother's house or her mother-in-law's house. I asked her if she had heard anyone at all, if she knew when the burglary had occurred, and she said no, that she didn't; she just waked up and shined the light over there and saw that Johnnie's bed was empty, and that was the only reason for knowing that he wasn't there.

"Q. Now,— A. I also asked her if they had anyone that was familiar with the premises there and she told me that there was a negro delivery boy that delivered for a drug store, and she didn't know his name, but I obtained a description of him from other members of the family." .

At this time appellant was sobbing more than crying, but "was not hysterical or anything like that."

About 4 o'clock all of the members of the Fitzhugh household, except Mrs. Bertha Fitzhugh were taken, apparently voluntarily to police headquarters. There the various parties were interviewed by the police.

At about 6 o'clock an interview with appellant began. Other members of the family were excluded from this interview, which was conducted by three or four officers, including Mr. Haley.

Prior to permitting examination of Mr. Haley as to statements made by appellant at police headquarters permission was granted appellant's counsel to examine Haley on voir dire touching appellant's

"mental condition to testify" at this time. On this voir dire examination Mr. Haley testified that appellant along with her husband, Cameron Fitzhugh, a brother-in-law, and Rose Mary Fitzhugh were brought to police headquarters. The husband and in laws were interviewed first. About six o'clock appellant was taken into a room by herself and interviewed. Some three or four officers were present at times, though Mr. Haley and Mr. McMurdo were the principal questioners. According to Haley appellant sobbed at times during this interview, possibly about a fourth of the time of the interview. During the questioning appellant "was telling as much as we was asking her; in other words, the conversation was divided, in my best judgment."

The court then ruled that the Solicitor could examine Mr. Haley as to statements made by appellant during this interview, to which ruling the appellant excepted.

After the voluntary character of such statements was again established Mr. Haley recounted them as follows:

"A. I asked her if she had—if the door was open when she first awakened and she said that it was, the screen door was open and the main door was open, too. Then I asked her if she had locked the screen door —latched the screen door and locked the main door before retiring, and she said yes, that she had, and that she left the light on in the front. I asked her how anyone could have gotten in without cutting the screen. The screen was not cut; I had observed that, and she said, 'Well, my husband opens the door;' said 'He takes hold of the handle and shakes the screen door and the latch will fly open; then he has a key. He takes his key and pushes the other key out and opens it with his key.'

"Q. All right, sir. A. She also described how the light in the front room, the table lamp was lit. The bulb—she told us she either had to pull the plug out or screw the lamp out of the place, that is the lamp globe, out of the lamp by taking a couple of turns on it to keep it from making contact, or either pull the plug out of the wall.

"Q. All right, did she say anything else in Captain Early's office? A. Yes, sir.

"Q. All right, if you will, proceed to tell us what else she said in response to your questions. A. We then questioned her about any obligations that they owed and about insurance on the child, she and other members of the family. She stated that she had been in financial trouble, and that—she related three loan companies that she owed some money to, approximately—Excuse me just a minute—she owed approximately $200.00 to three different loan companies; she owed about a $30.00 grocery bill and around an $18.00 drug store bill and $43.00 to a jewelry company on a watch that she had bought for her husband, and she stated that she had two insurance policies on Johnnie, and that she also had one one on the boy—I mean on the girl; I am not sure whether she said she had two on it or one, but that she had $1,000.00 endowment or an education policy and then a straight policy of $1,000.00; it is an industrial policy. We asked her if she had been pressed about the payment of any of those loans. She stated that she had; that that day a Mr. Johnson, from Ivy Johnson, I believe, is the first name, had called her up and threatened her with legal action if she didn't do something about her account, it was overdue. She stated she had not been able to meet the December payment on it, and that all three of the loans were overdue, and that she didn't see any way to make payments on that unless she got some money, and, that she must have just thought that was the only means for her to get any money was to collect the insurance. She said that she had not considered killing the child for any length of time, but that she had—was worried about that, and she also stated that the mother-in-law had put her house up for sale, and that that meant that she and her husband were going to have to find another place to live; and she stated that they were paying $26.00 a month rent at this particular place, but that the mother-in-law had deeded them a lot, and that they were faced with the possibility of having to build or having to find another place to live, one, at possibly a higher rent, and she just didn't see how they were going to be able to meet it when they couldn't meet those at this time due. She said that they were both not.

very good managers and that their money just didn't stretch just like it possibly should have. She stated that her husband was making $1.46 an hour working for the Tennessee Company and didn't know exactly how much that was a month, but that it ought to be enough to pay their expenses if they were good managers; but she said she had gotten in the hole a year or two back on grocery bills, drug store bills and so forth and had had to resort to loan companies. She also stated that her husband, Alex, had been drinking bad during that time; that was previous to this particular day, and that they had gotten in a little worse hole when he was drinking, and that she had resorted to these loan companies to get money to be able to pay the grocery bill and drug store bills, and had just gotten in such a hole that she couldn't make ends meet. And she stated that after her husband went to work, that she looked out and saw—waited until Cameron Fitzhugh, who works, she said worked for some testing laboratory, the Pittsburgh Testing Laboratory, I believe it was, didn't get in until close to midnight, sometime after eleven, and that she did wait until he got in and turned his light off, and said that she then got up and went to Johnnie's bed, took a diaper and wrapped the diaper around the baby's neck and pulled on the diaper, and said Johnnie quit moving; and said that after she had started that she was sorry that she had started doing it and that she wanted to quit but that she had made marks on the child's neck; she knew she couldn't explain those marks on the child's neck, she had to go ahead and finish the job. We asked her if she had intended to kill the other child, and she said no, that she hadn't. We asked her if she had intended to kill her husband; she said no, that she hadn't. We also asked her about the condition of the house, whether or not the house was in that condition, or how it was, and when she did it. She stated that after she had strangled the baby, she had set the scene then to make us think, or the authorities think, that a burglar had been there; that she pulled the drawers open and taken their belongings and strewed them and scattered them to make it appear that a burglar had

gained entrance and had ransacked the place; and she stated that the child—that she had told us wrong about having waked up and found the child in the front room, out of his crib and in the front room; and she stated that she also told her family, that is her husband's family, when she went down there, that the place had been tousled up, that it had been ransacked. I believe, is the words she used. We asked her if there were—was any other solution that she could think of for her financial difficulties other than the insurance, and she said that she just couldn't think of anything else; said that they had lived with Alex's folks, and that they were fixing to move out, and she didn't think they could give them the help that they would have to have to get started over. I might, by referring to my notes, give you more."

Over appellant's objection and exception a photograph of a diaper found by officers in the bath room of appellant's apartment was received in evidence. This diaper was found in a metal container in which there were other diapers and children's clothing. This particular diaper had creases running roughly diagonally across it from one corner to another. All parties handling this diaper from the time it was found until it was photographed, including the photographer, established the identity of the diaper and photograph.

There was also introduced into evidence two insurance policies covering the deceased. These policies were taken out by appellant in April, 1947, and provided for graduated amounts determinable upon the length of time they had been in force. Apparently around $420.00 would have been payable under these policies if enforcible.

For the defense the evidence was directed toward establishing the insanity of the accused at the time of the commission of this offense.

Appellant's mother and grandfather gave evidence tending to show that appellant's father had died when she was a few months old, and she and her mother had gone to the home of appellant's maternal grandparents to live. Appellant resided in this home until her marriage. Appellant was a ner-

vous and shy child, and that her conduct was rather unpredictable. She married Alex Fitzhugh secretly when 16 years old. This marriage was at times unhappy, and at one time appellant obtained a divorce, but remarried Alex Fitzhugh seven days after obtaining the divorce decree. Testimony of similar tenor was given by Alex Fitzhugh, who testified in his wife's behalf.

Several witnesses testified as to appellant's good character. It is to be noted here that a number of these witnesses, close acquaintances of appellant, testified that appellant was not unloved as a child, but on the other hand was loved as a child by her mother and grandparents.

The interrogatory testimony of Dr. Tarwater, one of the lunacy commissioners, was also read to the jury. On direct examination Dr. Tarwater testified that as a result of his study and examination of appellant during her stay at Bryce Hospital she was insane and incompetent at the time she caused the death of her child; that basically she was suffering from an hysterical state which is designated psychoneurosis, conversion hysteria, associated with a fugue state, in which there was disassociation of personality allowing subconscious motivation to overthrow conscious personality control at which time conscious control was insensitive and completely thrown aside.

The doctor further testified that actually there is very little differentiation between somnambulism and fugue state and frequently they are lumped in the same category. Somnambulism is the old familiar term sleep walking. It is a situation where the individual moves about automatically or subconsciously controlled without normal awareness of what he is doing.

There was also read to the jury the report of the lunacy commission, heretofore set out as to pertinent portions, which was attached to the interrogatories as an exhibit.

On cross examination Dr. Tarwater testified that appellant presented two symptoms that made him feel that she was in a somnambulistic or fugue state at the time she caused the death of her child, namely, loss of memory for the event and lack of emotional response to the event.

Dr. Tarwater did not believe that the fugue or somnambulistic state was existing six hours after the alleged killing, but that it ended when there was realization of the fact that something had happened to her child. Then consciousness took over and she carried the child to the house of her mother-in-law.

It is true that a patient may maligner successfully, and ability to maligner is associated with the patient's native intelligence.

Appellant was sane, in Dr. Tarwater's opinion during her entire stay at Bryce Hospital.

Because of its pertinence to the question now under consideration we will now quote the following portions of Dr. Tarwater's testimony on cross examination:

"Q. Let me put it this way: If Mrs. Fitzhugh gave a statement to investigating officers some six or eight hours after she is alleged to have strangled her child, in which statement Mrs. Fitzhugh gave great details concerning the commission of the act, is this recollection upon questioning by the investigating officers and a later total lack of recollection of the facts concerning the strangling of her child consistent with a somnambulistic state or fugue state as having existed at the time of the alleged commission of the act? A. In my opinion it is not consistent. Could I qualify this last answer a little before we leave it?

"Q. All right, sir. A. This answer is given presuming that it is correct that Dorothy Ruth Fitzhugh, without urging, coaxing or influencing in any fashion, willingly and in detail accurately described all of the events during the time the child was.

"Q. I will ask you if remorse and the conscious recognition of the commission of a crime during the actual commission of the crime is consistent with insanity? A. In my opinion conscious awareness of the decision to kill and the details of choking the child by Dorothy Ruth Fitzhugh is not consistent with the attitude and emotional tone that she presented or showed while she was a patient in Bryce Hospital."

In rebuttal the State presented three members of the Fitzhugh family, Cameron Fitzhugh, Rose Mary Fitzhugh, and Mrs. Bertha Fitzhugh, who testified that in their opinion the accused was of sound mind on the night she caused the death of her child.

In our opinion the photograph of the diaper found at the appellant's apartment on the night of this offense was properly received in evidence. The fact that the apartment was visited by a member of persons during the investigation in no way affected the inherent admissibility of this exhibit, but went to its probative value. The diaper itself was not in the same condition at the time of trial as at the time it was found and soon photographed, because of different creases resulting from it having been folded into an envelope after it was photographed.

Under the circumstances the jury could reasonably infer that the photograph was of the weapon causing death. Any weapon or implement used in the commission of a crime is ordinarily admissible in evidence. By analogy, a photograph of the weapon illustrating its condition at the time it was used to perpetrate the offense is admissible. Furher, the photograph of the diaper, with its creases running diagonally from one corner to another tended to shed light on a question highly material to the issues of this case.

Appellant's able counsel contends that appellant's confessory admissions made to the police officers were erroneously admitted, and that the doctrine enunciated in the cases of Palmore v. State, 244 Ala. 227, 12 So.2d 854; McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819, and Von Moltke v. Gillies, 332 U.S. 708, 68 S.Ct. 316, 92 L.Ed. 309, is applicable to, and should cause a reversal of this cause. The background and factual picture of the methods by which the confessions in the three above mentioned cases were obtained are so radically and materially different from the picture presented by the present case that in our opinion the doctrine of the three above said cases cannot properly guide us to a conclusion.

This State's rule as to the admissibility of confessions in evidence has been stated may times and is well understood. The question of its admissibility is addressed to the enlightened discretion of the trial court, and its weight is for the jury. Prima facie a confession is not voluntary, and evidence must be addressed to the trial judge rebutting that presumption and showing prima facie that the confession was voluntarily made, unless, of course, the circumstances attending the confession affirmatively disclose its character. Phillips v. State, 248 Ala. 510, 28 So.2d 542; Johnson v. State, 242 Ala. 278, 5 So. 2d 632, certiorari denied, 316 U.S. 693, 62 S.Ct. 1299, 86 L.Ed. 1763.

The predicate laid by the State was in all respects sufficient to show prima facie that the confessions were voluntarily made unless the circumstances were such, when considered with the age, character and situation of appellant, as to demonstrate that she was deprived of her free choice to admit, to deny, or to refuse to answer. The crime was discovered at about 12:15 A.M. Appellant was taken to police headquarters at about 4:00 A.M. and the confession made between 6:00 A.M. and 8:00 A.M. Her husband and members of his family went with her. Although she was isolated when questioned by several police officers, the questioning of a suspect while in custody of law enforcement officers is not prohibited either by the common law or by the Fourteenth Amendment, nor is a confession rendered inadmissible solely by virtue of the fact that it was made while the accused was in the custody of such officers. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; Lyons v. Oklahoma, 322 U.S. 596, 64 S.Ct. 1208, 88 L.Ed. 1481; Lisenba v. People of State of California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166; Logan v. State, 251 Ala. 441, 37 So.2d 753; Johnson v. State, 242 Ala. 278, 5 So.2d 632; Dyer v. State, 241 Ala. 679, 4 So.2d 311; Stone v. State, 208 Ala. 50, 93 So. 706; Curry v. State, 203 Ala. 239, 82 So. 489; Redd v. State, 69 Ala. 255; 2 Wharton's Criminal Evidence, Section 610 (11th Ed.—1935).

■ ■ Nor is the confession rendered inadmissible merely by virtue of the fact that the officers to whom the confession was made were armed. Phillips v. State, supra; Flanigan v. State, 247 Ala. 642, 25 So.2d 685; Hornsby v. State, 94 Ala. 55, 10 So. 522; McElroy v. State, 75 Ala. 9. While a confession obtained after prolonged examination can under certain circumstances render the confession involuntary, appellant's treatment in this case was not such as to question the humanity of the officers performing their duty, or to destroy the free will of an ordinary person. To conclude otherwise would unreasonably hamper law enforcement officers in the performance of their duties, and render innocuous reasonable effort to detect crime.

■ We are unwilling to say that the lower court erred in denying appellant's motion for a new trial because the verdict was contrary to the law and the evidence, and not sustained by the weight of the evidence. This of course involves the jury's conclusions as to the mental condition of appellant at the time of the commission of this offense.

No question of appellant's sanity at the time of the trial is presented, as it was the opinion of the lunacy commission that appellant was sane immediately upon the realization that her child was dead, and has been sane since.

It was further the opinion of the lunacy commission that appellant was insane, and suffering from psychoneurosis, conversion hysteria with fugue state at the time of the commission of the offense. Apparently to some extent the diagnosis by the lunacy commission of the mental condition of appellant included the personality study and history of appellant, supplied by the husband and parent, indicating that appellant was a detached and unloved child. It was probably significant to the jury that several of appellant's close acquaintances who testified as character witnesses gave testimony on cross examination tending to strongly dispute such status. It was also probably significant to the jury that Dr. Tarwater testified that appellant's ability to give a detailed account of her actions in killing her child some six or eight hours after the event, and a total lack of such recollection ability later, was inconsistent with the existence of a fugue or somnambulistic state existing at the time of the killing, presuming that appellant was not urged, coaxed, or influenced in any fashion, and willingly and in detail accurately described all of the events during the time the child was being killed. In view of the many minute details related by appellant in her statement the jury could infer, and in our opinion justifiably so, that her statement of these details, unknown to any other person, could hardly have been the product of any urging, coaxing, or influence on the part of the officers, regardless of their astuteness and ability as examiners.

This aside, it appears that the State offered three members of the Fitzhugh family, qualified by close association with appellant to express an opinion, who testified that in their opinion accused was of sound mind at the time of the commission of the offense.

■ Opinions of experts in the field of mental disorders as to an accused's sanity or insanity are of course admissible and certainly should be carefully considered by a jury. Such opinion evidence is not however conclusive on the jury. The responsibility is upon the jury to weigh all the evidence, expert and lay, pertaining to the issue of the accused's mental competency. The weight to be accorded all such evidence is solely within the jury's province. They may reject it all even though it is without conflict. Rex v. Earl of Ferrers (Eng.—1758), 19 Howell's State Trials 885, 943; Watson v. Anderson, 1848, 13 Ala. 202; McAllister v. State, 1850, 17 Ala. 434, 52 Am.Dec. 180; Parrish v. State, 1903, 139 Ala. 16, 36 So. 1012; Braham v. State, 1904, 143 Ala. 28, 38 So. 919; Howard v. State, 1911, 172 Ala. 402, 55 So. 255, 34 L.R.A.,N.S., 990; Robinson v. Crotwell, 1911, 175 Ala. 194, 57 So. 23; Anderson v. State, 1922, 209 Ala. 36, 95 So. 171; New York Life Ins. Co. v. Torrance, 1934, 228 Ala. 286, 153 So. 463; Boyle v. State, 1934, 229 Ala. 212, 154 So. 575; George v. State, 1941, 240 Ala. 632, 200 So. 602; Coffey v. State, 1943, 244 Ala. 514, 14 So.

2d 122; Lee v. State, 1945, 246 Ala. 343, 20 So.2d 471.

In face of the settled doctrines reflected in the above cases we are unwilling, indeed we think without the power or authority, to accord to appellant's counsel's insistence that the very fact that a young mother would kill her infant son is so contrary to all laws of maternal instinct and to the laws of nature as to establish, by its terrible enormity, the insanity of the mother. Even though a trial judge, or the members of an appellate court may have reached a conclusion different from that of the jury had a case been presented to him or them for an original decision, such does not warrant a reversal of a cause in which a jury, exercising their solemn prerogative to determine the issues has rendered a verdict which is supported by substantial evidence, and which verdict cannot rationally be said to be arbitrary.

It is our opinion that this cause is free of error probably injuriously affecting the rights of this accused, and it is due to be affirmed. It is so ordered.

Affirmed.

BRICKEN, Presiding Judge, not sitting.