198 So.2d 791

**Cranston CARR**

v.

**STATE.**

**6 Div. 157.**

Court of Appeals of Alabama.

Jan. 24, 1967.

Rehearing Denied March 14, 1967.

Beddow, Embry & Beddow, Birmingham, for appellant.

Richmond M. Flowers, Atty. Gen., and Robt. F. Miller, Asst. Atty. Gen., for the State.

PRICE, Presiding Judge.

Appellant, defendant below, was indicted for murder in the first degree for the killing of John Y. Hilton. At the trial he interposed pleas of not guilty and not guilty by reason of insanity. He was convicted of murder in the second degree and was sentenced to the penitentiary for a term of twenty years. He appeals.

John Y. Hilton, a police officer of the City of Haleyville, Alabama, was shot and killed in the evening of October 6, 1964.

Mr. Charles Benefield, a police radio operator, testified he saw Mr. Hilton at the Rebel Restaurant in Haleyville about 9:00 P.M. They left together and rode in the police car for about forty-five minutes and returned to the restaurant where they parted company. Officer Benefield drank a cup of coffee in the restaurant and then drove to the city hall, half a mile away, arriving there at 9:55 P.M. While waiting to go on duty he heard a voice over the police radio, which he recognized as John Hilton's say, "Get a doctor, I have been shot." After a few second's pause the same voice said, "Get a doctor, Crant Carr shot me." Mr. Benefield went immediately to the Wilson Hospital, arriving there two or three minutes after he first heard Mr. Hilton's voice on

the police radio. Mr. Hilton was already at the hospital and witness helped remove his shirt.

Mr. Bobby McNutt, testifying for the State, said that on the evening of October 6, 1964, between 9:30 and ten, he was driving home from his office on the Hamilton Highway when he saw two automobiles pulled off the road just below the Rebel Restaurant. When he got closer he recognized Mr. Hilton and the police car and saw defendant sitting in his automobile. As he passed these cars he saw Mr. Hilton getting out of the police car.· The witness drove on to the Rebel Restaurant and turned his car around facing the highway. At that time the defendant drove by. Mr. McNutt fell in behind him. The defendant was not driving fast but he failed to stop at two stop signs. At the stop sign near city hall witness saw a car behind him and recognized it as the police car with Mr. Hilton driving it. The police car passed him going in the direction of Wilson Hospital. The witness did not see a flash or hear a shot at any time during the events he witnessed.

Dr. W. K. Wilson testified John Hilton died in his hospital from bullet wounds at approximately 11:30 P.M., October 6, 1964.

Raymond Cobb, Sheriff of Winston County, testified he came to Haleyville on the evening of October 6th in connection with the shooting of Mr. Hilton and saw Crant Carr at his father's house at about 11:00 P.M. The defendant met the sheriff in the driveway and gave the sheriff a .22 rifle which he had in his hand. The defendant was arrested at that time.

Late in the morning of October 7, 1964, one R. L. Shirley, a reporter for the local newspaper, went to the jail at Double Springs to interview the defendant, and did interview him in his cell, with reference to the shooting of Officer Hilton. After proper predicate was laid as to voluntariness, Mr. Shirley testified defendant told him in the interview that he was riding around in his car when Officer Hilton

stopped him, got out of the automobile, and told him he was under arrest. Defendant asked, "What for? I haven't done anything." Officer Hilton answered that defendant was weaving across the yellow line on the highway. Defendant told him again he hadn't done anything to be arrested for. Mr. Hilton was standing close to the car and he took hold of the door handle and started to open the door. Mr. Shirley said that at this point defendant stopped talking and he asked him if he shot John Hilton. Defendant said, "Yes," and he also said that he had nothing against John Hilton, that he was a good friend and defendant had recommended Mr. Hilton for Chief of Police. The witness further testified defendant looked worried and at one point when they were talking about a child of defendant's that had died sometime prior to the shooting he began to cry; that getting the information as to the facts and circumstances of Mr. Hilton's death was a slow and arduous process and several times defendant would hesitate and stop talking. The witness did not tell defendant Mr. Hilton was dead.

Mr. Van Pruitt, an Assistant State Toxicologist, testified John Hilton died as a result of a bullet wound and that he removed two bullets from the body of deceased. These bullets were compared microscopically with bullets test fired from the .22 Caliber rifle defendant turned over to the sheriff and received by witness from the sheriff. Mr. Pruitt testified in his opinion the bullets taken from the body were fired from this gun.

The defendant did not testify and all of the evidence introduced in his behalf was in support of his plea of insanity.

The defendant's mother, Mrs. Ada Carr, and his wife, Mrs. Carolyn Carr, after stating the facts and circumstances on which their judgment was based, testified in their opinions defendant was insane on October 6, 1964.

Mr. Carl Garrard, defendant's father-in-law, after first stating his opportunity for

acquiring knowledge and the facts upon which his opinion was based, including the shooting of himself for no apparent reason by defendant one month before October 6, 1964, testified in his opinion defendant was insane on October 6th.

The provisions of Sec. 425 of Title 15, Code 1940, were invoked. The lunacy commission provided for by this statute was composed of Dr. J. S. Tarwater, Superintendent of Bryce Hospital, Dr. T. H. Patton, Clinical Director of said Hospital, and Dr. William B. Robinson, a staff psychiatrist. The depositions of these doctors were introduced in evidence and read to the jury. Each of these doctors stated that it was his opinion, based on his examination of accused together with defendant's medical and personal history, his reaction to abstract questions, his family background and past experiences, all of which were related by each doctor, that while defendant knew right from wrong, by reason of duress of mental disease he had so far lost the power to choose between right and wrong as not to avoid doing the act in question; that his free agency was at the time destroyed and that the defendant was insane at the time of the shooting.

The report of the lunacy commission, which was introduced in evidence, reads in part as follows:

"After full study and observation since the date of admission, it is the opinion of each of us separately and our opinion jointly and collectively, that the said Cranston R. Carr is presently mildly depressed, passive and apathetic, but not overtly psychotic, * * *. It is our further opinion that for some time prior to admission in Bryce Hospital and prior to the commission of the acts for which he is charged that he was, according to our information and study, under considerable stress and strain and was abnormally depressed to the degree that while he knew right from wrong he was unable to clearly define the difference and adhere to the right. In making this statement we feel that he was mentally ill and in need of psychiatric help for some time prior to the first unlawful act committed, which was the shooting of his father-in-law. We further feel that the second episode for which he is charged; that is, the shooting and killing of a policeman, who apparently was his friend, resulted from his continuing depression, anxiety and fearful state, possibly to some degree supplemented by his taking four one-half grain Codiene tablets and a considerable amount of Alcohol (Vodka) with suicidal intent, which may have accounted for what is thought to be partially an amnesic episode, in that there appears to be no memory or recollection concerning the shooting of his friend, the policeman."

The patient's (defendant) case history related by the members of the lunacy commission, obtained mainly from the patient and members of his family, and which includes many of the circumstances on which the non-expert witnesses based their opinions that defendant was insane, is summarized as follows:

He was inducted into military service at age 18 or 19; was wounded in the back by shrapnel which perforated the abdomen; that a bowel operation was performed in France. This operation included a Colostomy, bringing his bowels to the outside. He was subsequently removed to a hospital in England where an Appendectomy and closure of the Colostomy wound was performed. He was returned to the States and was hospitalized in various areas and spent some time recuperating in Florida. He was subsequently removed to Fort McClellan from which area he was discharged and went home. In June after he arrived home in January there was a period of illness, a rupture of a peptic ulcer or stomach ulcer, for which he was operated on by Dr. Blake. The rest of that summer was spent in recuperation. This was in 1946, and he was receiving a pension of $108.00 a month.

In 1947 the patient began working for himself, trading automobiles. He bought a truck and trailer, and a 54 acre farm four miles from town. He had cattle and hogs and raised some corn. He sold the farm in 1960 and worked for a cousin in a furniture appliance store eight or nine months. In 1961 he married. He was 35 and his wife was 21. He owned a home, worked at odd jobs and was getting 80 percent disability or about $160.00 a month. Things went well until 1963 when in March he lost a little boy who lived sixteen days after birth. This was his second child. The child was in three hospitals and was finally operated on in Birmingham. The patient said the child had an ulcer of the stomach or intestine and he became depressed and upset and felt that he was responsible for the child's death because of the fact he himself had an ulcer. He started going to Dr. Monasco and Dr. Moore for treatment of depression and nervousness. During that period, March 1963 to September, 1964, he lost from 185 down to 130 pounds. His finances were bad because of the three hospitalizations for the child. He couldn't sleep and he plunged into extra work in order to clear up his bills. His wife and mother and the Veterans Service Officer talked to him about going to the Veterans' Hospital for treatment of his nervous condition, but he wanted to pay his bills and felt he could not give up his work. In the fall of 1963 he started working for a building and plumbing company, then in three or four months he got a job with the City as radio and telephone operator for the police and fire departments. When asked about his marriage, he said it was happy until last Fall when he began thinking his wife was too hard on him. She fussed about his taking on so much work and being away from home so much. Then he said he would go home to pick up his tools and they wouldn't be there and he would accuse her of moving them. When he was asked whether or not he thought she moved them, he said, "No, I think I didn't know where they were."

For a period of time at the police and fire department defendant was working the shift from ten o'clock at night until six o'clock in the morning, then one of the workers dropped out and he started on a 24 hour shift every other day. The boy that dropped out had the shift just before the ten o'clock shift and there was considerable trouble because this young man and one of the policemen were bringing women to the jail at night. The defendant said the Chief came down one night and found the situation and dismissed the young man who worked the prior shift. Then these two people tried to get defendant fired from his job. He began to get threatening calls but he never found out who was making the calls. The young man tried to get him to frame the policeman, they had fallen out, but he refused and they later became friends again and the young man and policeman both resigned. (It seemed the young man was not fired but later resigned.) The policeman came later to pick up a radio that had been left by some prisoner for a bond but defendant said the property belonged to the City and he wouldn't let the policeman have it, and it was after this these two went to the Aldermen and tried to get him fired. He talked to the mayor who advised him to get a permit to carry a gun after all the threatening calls were coming in. The mayor signed the bond for his pistol.

On August 30th a baby was born to his wife. It was a Caesarean birth and when she was dismissed from the hospital she went to her parents home. He made several calls to get her to come home but she would say she would be more properly cared for at her parents home since he was away from home so much. He made one half-hearted effort to get a nurse or some person to stay with his wife, but he said this person worked for a doctor and he couldn't get her and he made no further effort to get anyone.

On one occasion he went to see his wife. She was sitting on the front porch and he begged her to come home. Her father was

in a room next to the porch and he mentioned it wasn't good for her to go home just then, that she was being taken care of pretty good. When the father-in-law made this statement Carr pulled out his pistol and shot him. He said his father-in-law was not armed and had not threatened him. His brother-in-law wrestled him to the floor after the shooting and he was arrested and placed in jail, where he remained for about fifteen days. When he was released on bond the mayor sent word for him to come back to work whenever he felt like it and he did go back to work in the same job at the Police and Fire Department. Then he went to the hospital to visit a friend, his wife's uncle, and found his wife and older child visiting this person. He had not expected to find his wife there and was surprised to see her. He begged her to come home, but she said the younger child was asleep at the home of her parents and she felt she should go back there but agreed to move back home the next day. The witness thought this was not a firm agreement because the patient went on to say he told his wife he was going home and kill himself if she didn't come home, that he had nothing to live for. He said when he got home he took four half grains of Codeine and drank two-thirds of a pint bottle of Vodka. When asked if this was a suicidal attempt, the patient said yes, and that he chose that method to commit suicide because he had had a friend or acquaintance who had committed suicide by taking some medicine and drinking Vodka. He said he took the Codeine and drank the Vodka about eight or nine o'clock that night and that he didn't remember anything else until he was arrested the next morning. He said he was told the next morning that he had shot Mr. Hilton and that he did not recall having seen Mr. Hilton and that Mr. Hilton was a good friend of his and there was no reason for his doing anything to Mr. Hilton.

On cross examination Dr. Tarwater testified from what he learned from Mr. Carr the loss of memory evidently occurred the same night as the shooting of the policeman,

that he was unable to give information about leaving the house. He stated further that Codeine is a narcotic derived from Opium; that the two grains of Codeine taken by defendant was not a sufficient amount to produce a crazed, confused state, but that the alcohol and Codeine taken together could produce pretty much of a drunken state. This witness also testified in answer to a hypothetical question, that if it be true that the defendant related all the events concerning the shooting to Mr. Shirley in the interview the next morning, being at the time unaware that Mr. Hilton was dead, he would think he did remember it.

Dr. R. F. Blake, defendant's family physician, testified that several years before October 6, 1964, defendant had been his patient. After Mr. Hilton was killed he examined defendant in the jail and he diagnosed his condition as manic depressive, psychotic. A manic depressive is a person who is moody. One time he feels he owns the whole world, then he gets on a "low limb." When he is on the "low limb" he is dangerous. To be insane a person would have to be psychotic.

In Wingard v. State, 247 Ala. 488, 25 So. 2d 170, the court reiterated the rule that

"to sustain the defense of insanity the evidence must establish that at the time of the commission of the crime the defendant was afflicted with a diseased mind to the extent that (1) he did not know right from wrong as applied to the particular act in question, or (2) if he did have such knowledge, he, nevertheless, by reason of the duress of such mental disease had so far lost the power to select the right and to avoid doing the act in question as that his free agency was at the time destroyed, and (3) that, at the same time, the crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it solely."

██ The question of insanity at the time of the commission of a crime is a

matter to be determined by the jury from a consideration of all the evidence. The defendant in this case is presumed to be sane, and the burden of establishing his insanity to the reasonable satisfaction of the jury rests upon him. Title 15, Sec. 422, Code of Alabama 1940. See Boyle v. State, 229 Ala. 212, 154 So. 575; Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, cert. den. 260 Ala. 699, 71 So.2d 107. In the Pickett case, supra, the court said:

> "Even undisputed expert medical evidence is not conclusive upon the jury, but must be weighed like other evidence, and may be rejected by the jury. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533; Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831, certiorari denied 253 Ala. 246, 43 So.2d 839, certiorari denied 339 U. S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388."

After considering the evidence in the case we are of opinion the trial court ruled correctly in refusing the affirmative charge and in denying the motion for a new trial.

Objections by the State were sustained to the following questions propounded to Dr. William B. Robinson, a member of the lunacy commission, and these questions and answers were deleted from the deposition and not read to the jury:

"Q. Doctor, could the statement I have mentioned in the report of the 12th day of February, 1964, be further paraphrased to mean that the defendant had the capacity to know right from wrong in this instance, yet was acting under an irresistible impulse preventing the choosing of the right or compelling the defendant to commit the wrong?"

"A. In essence, Yes, sir."

"Q. Would this be your opinion of Cranston Carr on the 6th day of October, 1964?"

"A. Yes, sir."

"Q. Further, could it be paraphrased to mean that the defendant had the capacity to know right from wrong in this instance, yet was acting under an irresistible impulse preventing him from choosing the right or compelling him to commit the wrong?"

"A. In essence, Yes, sir."

"Q. Is that your opinion?"

"A. Actually, I don't see the difference in this one and the one before."

"Q. In essence that is synonymous with the statement of February 12, 1965?"

"A. Yes, sir."

"Q. And this is your opinion of Cranston Carr's condition on the 6th day of October, 1964?"

"A. Yes, sir."

It is argued in brief that the court erred in the above rulings because Dr. Robinson was not allowed to state the act of defendant in shooting Mr. Hilton was the result of an "irresistible impulse."

We find no reversible error in the court's rulings. The questions and the report on which they were based pretermitted that the irresistible impulse must be the offspring of mental disease and that such disease must be the sole cause of the act. Parsons v. State, 81 Ala. 577, 2 So. 854; Thompson v. State, 23 Ala.App. 529, 128 So. 461; Phillips v. State, 248 Ala. 510, 28 So. 2d 542. Wingard v. State, supra; Barbour v. State, 262 Ala. 297, 78 So.2d 328.

We also point out that although the report of a lunacy commission is not admissible in evidence, Benton v. State, 245 Ala. 625, 18 So.2d 428; Hawkins v. State, 267 Ala. 518, 103 So.2d 158, it was introduced here without objection. But we think the trial court should not be placed in error for disallowing questions based on the report to which objections were interposed.

On cross examination Dr. T. H. Patton, also a member of the lunacy commission, was asked this question:

"Q. If he had called the sheriff and told the sheriff to come and get him and that he would surrender to the sheriff or his deputy but not to the city policeman, would that indicate to you he knew he had done something wrong?"

Defense counsel's objection was overruled. The witness answered, "Yes, sir."

■ It is insisted that the court erred in allowing the witness to answer, on the ground the question assumes facts, a finding of which is not warranted by the evidence already introduced, or promised to be introduced later. In Owens v. State, 215 Ala. 42, 109 So. 109, the court said:

"On direct examination hypothetical questions to an expert must conform to tendencies of the evidence; but on cross examination, where the purpose is to test the value and accuracy of opinions expressed, the above limitation does not apply and the range of examination is left largely to the discretion of the trial court."

See also Parrish v. State, 139 Ala. 16, 43, 36 So. 1012; George v. State, 240 Ala. 632, 200 So. 602. We are of opinion the court's discretion was not abused in this instance.

Furthermore, if there was error, it was error without injury. Supreme Court Rule 45. The witness testified it was his judgment the defendant knew right from wrong. Also the preceding question to this witness to which no objection was interposed was whether if such call was made to the sheriff, "would that make any difference in your diagnosis?" The answer was:

"I don't think so. Honestly, the effect of the thing I feel that he definitely was psychotic and the effect of doing the thing and then realizing what he had done might have brought him enough out of his depression to be able to react in that fashing." (sic.)

■ The following requested charge was refused to defendant:

"#56. I charge you, gentlemen of the jury, that after due deliberation and consideration of the law and evidence in the case; whereupon should your verdict be not guilty by reason of insanity then it would be the duty of the court to commit the defendant to the Alabama State Hospital at Tuscaloosa."

This charge does not state a correct principle of the applicable law and was properly refused. Section 429 of Title 15, Code 1940, reads:

"When a person has escaped indictment, or been acquitted of a criminal charge on the ground of insanity, the court, *being informed by the jury or otherwise, of the fact, must carefully inquire and ascertain, whether his insanity in any degree continues, and, if it does,* shall order him in safe custody, and to be sent to the Alabama state hospitals."

The only question in this connection was whether defendant was "not guilty by reason of insanity". Boyle v. State, 229 Ala. 212, 154 So. 575.

■ Error is alleged in the court's allowing the witness Benefield to testify as to the statement of deceased over the police radio that, "Crant Carr shot me." The witness stated he had known Mr. Hilton for about ten years; that they had been together for forty-five minutes just before Mr. Hilton was shot; that he recognized deceased's voice when it came over the radio; that he was at the hospital within three minutes and saw deceased there. The identification of the voice on the radio was sufficient to admit the statement heard by the witness Benefield. Dentman v. State, 267 Ala. 123, 99 So.2d 50.

It does not definitely appear how long an interval had elapsed between the shooting and the declaration by the injured person, but we think it could be inferred that the time was short enough to free the statement of deceased from any suspicion of afterthought. Harrison v. Baker, 260 Ala. 488, 71 So.2d 284.

We find no reversible error in the record. The judgment is affirmed.

Affirmed.