221 So.2d 695

**Grady Lee LUSTER**

v.

**STATE.**

**6 Div. 358.**

Court of Appeals of Alabama.

April 8, 1969.

Chas. Tartar, of Tartar & Wininger, Birmingham, for appellant.

MacDonald Gallion, Atty. Gen., and Walter S. Turner, Asst. Atty. Gen., for the State.

ALMON, Judge.

Appellant was charged by complaint with the offense of indecent exposure. He interposed pleas of not guilty and not guilty by reason of insanity. The jury returned a verdict of guilty and appellant was sentenced to twelve months hard labor for the County.

Appellant alleges error in the failure of the trial judge to grant his motion for new trial insisting in brief that the State failed to meet the burden of proving that the act of appellant in exposing himself was willfully and intentionally done and that the verdict of the jury was contrary to the evidence.

Appellant's main contention is that the proof of insanity was so clear, strong and

undisputed that the trial judge should have granted his motion for a new trial. The affirmative charge with hypothesis was not requested.

The State called as its only witness a young girl approximately fourteen years of age at the time of the alleged offense. Her testimony in summary was that at about 12:45 P.M. in the early part of July, 1966, she was walking on the edge of "someone's" yard along Cloudland Drive, a street in Bluff Park on top of Shades Mountain, in Jefferson County, Alabama, about one block from her house, when she noticed a light blue pick-up truck approaching. The truck stopped about two feet from the girl and the appellant, inside the truck with his window down, exposed his genitals to her and uttered certain vulgar words not necessary here to elaborate. The entire incident took about ten seconds and appellant drove away. The appellant made no threatening motions toward her other than those already mentioned. After appellant drove away, the girl ran to a house across the street and wrote the tag number of the truck on a piece of paper and then called the sheriff.

The defense called ten witnesses who testified that the appellant's general reputation in the community in which he lived or worked was good.

Dr. Mallory Forbes Miree, a Birmingham Psychiatrist, was called as a defense witness and testified that appellant came to see him professionally on July 25, 1966, and complained of a compulsion to expose himself. We think it here pertinent to note that this was subsequent to July 7, 1966, the date on which the complaint was made in this cause. Dr. Miree related to the jury a history which was taken from appellant and we set out certain portions thereof as follows:

"Mr. Luster was a forty-six-year-old married man, who presented on July 25th of last year, a complaint that he needed help.

"He is a self-employed appliance service man.

"He stated that he had been wanting very much to seek psychiatric assistance for some time, but could not quite get around to doing it.

"An event that happened just prior to my seeing him brought him to do it, and that exposure to a fifteen-year-old girl, that apparently got his automobile number and turned him in.

"He was, at that time, married, and still is. His wife is thirty-six, and he had four children at that time, ages twenty, eighteen, fifteen, and six.

"He is a very conscientious worker, working according to my history, in the morning, or afternoon, and frequently going back home and working evenings until 9:00 or 10:00 P.M.

"This specific problem he related to had been going on quite a number of years, and it was an urge to exhibit his privates.

"Some years ago, this had been to such an intensity that he couldn't take his family swimming, because seeing women in bathing suits would be more than he could tolerate, and he would always invent some excuse not to take them swimming.

"About eleven years ago, he was in a state of intoxication, and, I am sure, a great deal of emotion confusion also, and he approached his older daughter sexually. This was stopped, and he said he came to his senses at that point, and, according to the information I obtained, there was no other attempt to his family since that time.

"A week prior to his coming to see me on the 25th, he said he had his penis out, in the truck, and showed it to this little girl. She was fifteen years old, and this was in Bluff Park.

"He was riding along the street, and the sexual tension was very strong in him at that time. As in the past, he found

this very gratifying to his own sexual needs.

"It isn't clear to me what time all of this began, or, really, when the seizure, so to speak, of this problem began, but at least around the age of nine.

"He, being the youngest boy in a family of seven children, he would be left out of Sunday trips. I am not sure why this was, and apparently he wasn't either, but it would be his job to keep the house while the other kids in the family enjoyed a Sunday afternoon ride. If anyone was left out, it was him, and it was quite saddening to him.

"He married when he was around twenty-two, or twenty-three, and it is difficult to say what the relationship was between him and his mother. Usually, this all leads up to this sort of thing.

"My conclusion, or impression, at that time was that he had a sexual deviate pattern of behavior, and was suffering from a severe depression behavior of long standing."

Dr. Miree's testimony continues on matters of treatment, diagnosis and prognosis as follows:

"I started him on tofrenil, which is an antidepressant.

"I saw him on August 1st, and he was still quite depressed. He had had urges to exhibit himself, but had not.

"He was awakening in the morning, around 4:00 o'clock, and crying like a baby.

"The continuation of these urges, the early morning awakening, and the crying spells all go together to make up the depression.

"At that time, I decided it was appropriate to go ahead with shock treatments, since it was my opinion that the most compromising aspect of his trouble was his depression. He was unable to afford hospitalization. By the way the clinic is set up, we can give shock treatments by giving sodium pentothal, first.

"On August 3rd, I saw him again, for a second treatment. He was depressed, but was somewhat witty. He was sleeping better.

"At that time, I started him on a tranquilizer, which was mellaril, and proceeded with the shock treatments about every other day.

"By August 19th, my notes show that he was doing quite well. This was his 8th treatment by then.

"He was continuing to work, and, again, there was some urges to exhibit himself, but he had managed to control it.

"Then, on October 10th, he was continuing to improve, and a refill of his medication was given.

"November 7th: 'He was doing well.'

"He had had a total of ten shock treatments, and his sexual drive, in the sense of exhibiting himself had totally diminished, and there was no temptation at that time to exhibit himself.

\*   \*   \*   \*   \*   \*

"He was seen by Doctor Herbert Eber, and Doctor Eber found, to go through some of his findings here:

" 'The data here indicates a person of normal intelligence, whose functioning for new learning situation is somewhat impaired, apparently because of psychotic pathology mentioned below.

" 'Bender-Gestalt data were used to check for evidence of organisty, and no significant such evidence appeared.

" 'The personality characteristics showed a highly introverted patient with severe neurotic problems and extremely high anxiety; MMPI data strongly suggest that psychotic pathology is also present. This could be—'. These terms might be confusing to you, and I will try to elaborate on them as best I can."

"Neurotic anxiety is anxiety any of us feel when we get into a situation that is unpleasant, whether we are getting ready to make a speech, or we get nervous and don't know why. That is normal. It is quite incapacitating, so far as a person being able to function as he would normally.

"He went on to say that he had this to psychiatric proportions.

\* \* \* \* \* \*

"I was mentioning about the psychotic pathology.

"The major areas of mental illness we have are neurosis and psychosis.

"With neurosis, we continue to do our work.

"Psychosis, is mental illness, where activities are going on in the world, but without his notice. That is most severe. In the testing, he had significant elements of this, and it seems he had a long term pseudo-neurotic schizophrenic process.

"Q. (BY MR. TARTER) Would you explain that, Doctor, what you meant when you said that?

"A. Pseudo-neurotic schizophrenia is the major form of mental illness. Psychosis and schizophrenia are synonymous, and a pseudo-neurotic schizophrenic would be a person that has an illness that would appear neurotic. He would be very self-conscious and nervous, but was able to get on with his daily chores, roughly, but underneath his neurotic adjustment would be a much more serious mental illness, and oftentimes, if a person is in a weakened condition because of excessive stress, or of an illness, a more serious illness will show up.

" 'Prognosis for relief of the depression and of the psychosis with psychiatric treatment seems favorable."

\* \* \* \* \* \*

"Q. I will ask you whether or not your own opinion would be, or whether or not, based upon a reasonable medical certainty,

he was afflicted with a disease of the mind, such as abnormal depression?

"A. Yes, he was.

"Q. I will ask you whether or not he knew the difference between right and wrong, based on your own medical opinion?

"A. This is very difficult, and I don't guess anybody can really know in a situation similar to this.

"The writings about exposure, or exhibitionism, a person prone to exhibiting himself is often quite involved in his fantasies of a sexual nature like this, which we are all capable of doing.

"Driving a truck, as he was doing, a person becomes intensely involved with this, and, a person walking down the street, the situation is right for him to exercise his fantasies.

"Q. If a person asked him, immediately after this, if this was right or wrong, would he say it was wrong or right?

"A. I think he would say it was wrong.

"Q. So far as actuality was concerned, he would actually know the difference between right and wrong?

"A. At the time of the exhibitionism, I think, probably so.

"Q. He would probably know that it was wrong?

"A. Right.

"Q. And would know the right thing to do. I know it is very academic, but, limiting it to that question of right and wrong, would he know the difference between right and wrong as we know it?

"A. I think, if a person would have been standing there, that this would have startled him into reality, and he would say this is wrong.

"Q. Had he, in your opinion, lost touch with reality?

"A. This is academic, again.

"Q. I will ask you, in your opinion, based upon a reasonable medical certainty, had he, at that time, by reason of the duration of this mental disease which you described, so far lost the power to choose between right and wrong as to the act in question that his free will or agency was destroyed?

"Do you understand what I am saying?

"A. I think his ability to adhere to the right was severely compromised.

"Q. Was this act a result of a diseased mind?

"A. Yes. I think the fixation of showing himself, which is a very infantile sexual behavior, was secondary to some childhood experience, that isn't clear at this time, and it was complicated further by the severe depression that has been burdening him for years.

"Q. I will ask you whether or not he had, by reason of the duration of this mental disease, so far lost the power to choose between right and wrong to such an extent that his free will and agency were destroyed in making that decision?

"A. I can't answer that. This is something that has been going on—it is a pattern that he has exercised for ten or fifteen years, and we all know that any habit we get into it is hard not to repeat it.

"I think the intensity of depression he had been under was severe enough to compromise his adhering to the right.

\*      \*      \*      \*      \*      \*

"Q. (BY MR. WILKINSON) Doctor, would it be fair to say, in your opinion, that the defendant, Mr. Luster, when he is in these situations where he sees a young girl walking down the street and he has a desire to expose himself—would it be fair to say he was more tempted to expose himself than an average person would be?

"A. Yes.

"Q. But it is something, under given circumstances he could resist, isn't it?

"For example, if a policeman were there, he could resist it?

"A. Yes.

"Q. Is that true?

"A. I think so.

"Q. And you wouldn't say Mr. Luster had no contact with reality completely during those times, would you?

"A. I don't know that I could say—if I think; if a policeman were there, he wouldn't have done it.

"Q. So, he would be in that much touch with reality, wouldn't he?

"A. Yes.

\*      \*      \*      \*      \*      \*

"Q. Doctor, you have already testified, I believe, that this man could, in many circumstances, control the impulse to exhibit himself?

"A. Yes, sir.

"Q. And you have also testified that under those same circumstances he was aware, or was probably aware, that it was wrong at the time he was desiring that?

"A. I don't know about that. I think the temptation and fantasies that he builds up would be so great that if a policeman weren't there—I don't know if he could stop it, or not.

"Q. But if a policeman had been there he could probably have stopped it?

"A. Yes.

"Q. Doctor, had you ever seen Mr. Luster prior to July 25th of last year?

"A. Not to my knowledge.

"Q. And when he came to you he told you, I believe, that he had been arrested, is that right?

"A. It came out.

"MR. WILKINSON: That's all. Thank you."

**24**

As to appellant's contention that the State failed to prove the act was willfully and intentionally done, we quote from Truett v. State, 3 Ala.App. 114, 57 So. 512:

"The offense [indecent exposure] is complete if the act is intentionally committed at such time and place and in such manner as to offend against public decency, and the intent may be inferred from the recklessness of the act. Van Houten v. State, 46 N.J. Law, 16, 50 Am. Rep. 397."

In Carr v. State, 43 Ala.App. 642, 198 So.2d 791, Presiding Judge Price stated:

"The question of insanity at the time of the commission of a crime is a matter to be determined by the jury from a consideration of all the evidence. The defendant in this case is presumed to be sane, and the burden of establishing his insanity to the reasonable satisfaction of the jury rests upon him. Title 15, Sec. 422, Code of Alabama 1940. See Boyle v. State, 229 Ala. 212, 154 So. 575; Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, cert. den. 260 Ala. 699, 71 So.2d 107. In the Pickett case, supra, the court said:

" 'Even undisputed expert medical evidence is not conclusive upon the jury, but must be weighed like other evidence, and may be rejected by the jury. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533; Fitzhugh v. State, 35 Ala.App. 18, 43 So.2d 831, certiorari denied 253 Ala. 246, 43 So.2d 839, certiorari denied 339 U.S. 986, 70 S.Ct. 1007, 94 L.Ed. 1388.' "

After considering the evidence in this case, we are of the opinion that the trial court ruled correctly in denying the motion for new trial. We do not feel that this is a case where the proof is so clear and so strong that we should invade the province of the jury.

The judgment in this cause is due to be and the same is hereby

Affirmed.