302 So.2d 562

**Frank Robert BREEN, Sr.**

v.

**STATE.**

**I Div. 453.**

Court of Criminal Appeals of Alabama.

Oct. 29, 1974.

---

I. Hunt v. State, 248 Ala. 217, 223, 27 So.2d 186.

David L. Barnett, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was indicted for, and convicted of, murder in the second degree and sentenced to ten years imprisonment in the penitentiary. At all stages in the trial below he was represented by able, astute and resourceful counsel under pleas of not guilty and not guilty by reason of insanity. After conviction he was found to be indigent and a free transcript was furnished him. One of his trial lawyers was appointed to represent him on appeal.

Appellant was put to trial upon a four-count indictment charging, inter alia, that he killed the deceased, (1) "by beating him with his fists and kicking him with his feet, but without premeditation or deliberation"; (2) "by beating him with his fists, etc."; (3) "by kicking him with his feet, etc."; and (4) "by some means to the grand jury unknown, etc.".

The facts leading up to the homicide are not in dispute. In the late afternoon of February 5, 1973, appellant, Leon Murphy (the deceased), and one Marvin Finger (appellant's accomplice), and an unnamed man were at the Little Turf Club in Mobile. The deceased preceded appellant and Finger to the Club and was drinking beer and playing billiards when the latter two entered the Club. Appellant had one beer at the bar but he was not intoxicated. All four of them left the Club in a taxi cab.

The cab transported the four men to the Hammel Building where the unnamed man

was left. The cab driver then carried appellant, the deceased, and Finger to a State Liquor Store where the trio made a purchase, including several bottles of wine. The men were carried to the Star Fish and Oyster Company where they left the cab. According to the cab driver, none of the men were intoxicated though the driver smelled the odor of alcohol.

While on the dock of the fish company, according to appellant's statement, all three began to drink but he did not drink as much as the deceased and Finger. An altercation ensued between the deceased and Finger but was short-lived, and the deceased left the dock. While the deceased was gone, appellant and Finger sat on the boats and discussed "getting" the deceased the next time he pushed Finger around. In appellant's words, "I told him, yeah I'll help you." A short time later, the deceased returned to the dock and appellant and Finger got off the boat and walked toward the deceased. According to appellant the deceased "started some —— with Marvin." Finger hit the deceased with his fist, knocking him toward appellant, who grabbed the deceased and hit him with his fist. The deceased fell to the dock and appellant kicked him several times on the head with his right foot (shoe). Appellant and Finger fled the scene on foot and went to the freight yard of a railroad company four-tenths of a mile away. They went in the yard office and bought some potato chips and a coca-cola. They went back to the freight yard and were loitering near some unlocked trucks and cars parked on private property. The yard foreman called the yardmaster tower on a walkie-talkie and told them to get these men off the premises. The time was between 6:00 and 7:00 p. m., shortly after the killing. It was now dark.

A few minutes later an officer of the Mobile Police Department arrived at the freight yard and found appellant and Finger. The officer asked the two where they were coming from and their names and identification. Appellant and Finger first said they were from Alabama and then changed that to Montgomery. The officer with the use of a flashlight looked over appellant and noticed that he was dirty, sweaty, had blood on his hands, on his pants leg and on his shoes. He asked appellant where the blood came from and he replied that he cut his hand on a nail on a freight car, but the officer could not find a cut or laceration on his hands. Finally appellant produced identification which showed a Mobile address. The officer put appellant and Finger in the squad car while he used the police radio to check out appellant through the N.C.I.C. Before any information came back on this check, the officer received a radio message to carry the two men to the Star Fish and Oyster Company where detectives were investigating the slaying of Leon Murphy.

Upon arrival at the fish company, the officer observed the dead body of Murphy lying on the dock. There were several officers present and ambulance attendants. Appellant and Finger were advised of their constitutional rights and were carried to the Detective Bureau in separate squad cars. At the Detective Bureau, appellant appeared calm and he was cooperative. The officers noted nothing unusual about his actions or appearance, except that his clothes were dirty and blood-splattered. They also observed blood on his hands, pants leg and shoes. The officers smelled alcohol on appellant, but he was not intoxicated.

He was again given the *Miranda* rights and warnings and appellant freely and voluntarily signed a waiver of rights form. Appellant told the detective that he knew he was guilty and wanted to get it over. He then gave the officers a detailed oral statement which was taken by an office secretary on the typewriter and typed in his own words. After the statement was typed, it was removed from the machine and read to appellant. He acknowledged that it was correct and voluntarily signed

his name thereto. The statement in full is as follows:

"MOBILE POLICE DEPARTMENT CRIMINAL INVESTIGATION DIVISION

DATE: February 5, 1973—9:30 P.M.

OFFENSE REPORT NUMBER 42645

"I, Frank Robert Breen, Sr., HAVING BEEN ADVISED OF MY RIGHTS, DO HEREBY MAKE THIS VOLUNTARY STATEMENT TO OFF. James Ogan and Henry Wilson OF THE MOBILE POLICE DEPARTMENT, WITHOUT FEAR, THREATS, OFFER OF REWARD OR ANY UNDUCEMENTS (Sic) WHATSOEVER. I ALSO UNDERSTAND THIS STATEMENT WILL BE USED IN A COURT OF LAW.

"L (Sic) met this man in the pool hall. Jimmy's Pool Hall we left the pool hall and met this other fellow. This man I don't know his name said do you want to come with us down to the docks. I said OK. They got some wine four bottles at least. Then we went to the docks and went up on a fishing boat. There was three boats at the docks. After we got on this boat. There was two other boats. We started drinking and I didn't drink to (sic) much. We went to the docks on (sic) a cab. The two men I don't know there (sic) names but they got to drinking heavy and this was 4:30 P.M. The guy in the hospital started pushing this other fellow around. This was his buddy. The two got in a fight. Marvin said to me you want to get this guy the next time he starts pushing me around. I told him yeah I'll (sic) help you. Then this other guy went some where some where (sic). Then me and Marvin got off the boat and was walking towards the fish office. Marvin's buddy came at us and he started some —— with Marvin and Marvin slugged him and the man fell towards me and I grabbed him and hit him. This man fell to the ground (Leon Murphy) (sic) I kicked him two or three times with my right foot. I couldn't see as it was pretty dark. This man was out on the ground. Marvin said lets (sic) go. This man was knocked out and we left and Marvin said lets (sic) go get a cab. We were waiting for a cab and the police came. They arrested us and brought us to the Police Station.

"I can not read to (sic) good and I have had this statement read to me by Sgt. James Ogan and I swear that it is a true statement to this best of my knowledge and belief.

"/s/ Sgt. J. M. Ogan Sgt. Henry Wilson Frank R. Breen Sr."

By stipulation, the coroner's report was admitted in evidence. This report, in pertinent part, reads as follows:

"The body is that of a 43 year old white male, with violent injury seen about the head and face. The skull is crushed, the face bones are crushed, lacerations are seen over the face and it is a bloody mass of compressed, distorted, lacerated tissue, hardly recognizable as a human face. No other injuries are seen over the body which is clad in a brown sweater and yellow sport shirt and brown pants with underwear.

"DIAGNOSIS: Death due to fractured skull and crushed brain with multiple lacerations and injuries to the face, traumatic."

A voir dire hearing was had out of the hearing and presence of the jury to determine the voluntariness vel non of appellant's confession. Considerable testimony was heard by the trial judge on this question which covers well over a hundred pages of the transcript. At the conclusion of this hearing, the court ruled the confession was knowingly, voluntarily and intelligently made. After the proper predicate was laid the confession was read to the jury.

The only evidence offered by appellant was in support of his special plea of not guilty by reason of insanity. Testifying in appellant's behalf were a psychologist, a neurologist, and a psychiatrist. The testimony of these experts is adequately summarized in the state's brief and argument from which we take the following:

"The doctors agreed that the Appellant has psychomotor epilepsy. Psychomotor epilepsy is a condition under which the party is subject to seizures or fits. The seizures are characterized by a blacking out and a repetitive continuation of whatever the party was doing just prior to the seizure. (Eg. walking, driving a nail, etc.) The seizure may last from a few minutes to several hours. During this period the party is utterly unable to control his actions. He becomes, during the course of a seizure, an automation, acting without thinking, knowledge or volition. Following the seizure the individual is dazed for several hours and lacks control of his faculties. Finally, when not having a seizure the party is normal.

"Dr. John W. Davis, a twenty-nine year old psychologist, testified that he examined the Appellant on April 25, 1973, nearly three months after the crime, for three hours. This examination was the result of his being retained by the defense. As a result of this brief and belated examination the doctor reached the following firm conclusions: First, that the Appellant had a seizure at the time of the crime and committed the crime as a result of the seizure. Second, that the Appellant could not make a voluntary waiver of rights or statement for sometime after this presumed seizure. However, the doctor was considerably less certain about other relevant matters. He was not clear on the effect of alcohol, for example, saying first that it would have a profound effect on the epileptic, then implying that the effect would be the same that alcohol had on a normal person. The doctor testified that

being in a fight could bring on a seizure. He said, on the same point, 'It is possible'. Yet, when asked to go from epileptics as a class to the Appellant as an individual, the psychologist switched from possibilities to certainties. He said: 'I am certain of my opinion that he did have a seizure as a result of the fight.' The most interesting aspect of the psychologist's testimony concerned the ability of psychomotor epileptics to remember the details of what happened during their seizures. This was important because the Appellant gave the police a detailed account of the crime immediately afterwards. The doctor stated that such epileptics only rarely recalled anything about their seizures. He did not know if the Appellant's was one of the rare cases where memory occurred or not. The doctor stated that it would take the Appellant three or four hours to come out of the seizure completely and that during this period it was highly unlikely that he would be able to relate details about what occurred.

"Dr. William B. Patton, age 62, is a licensed neurologist. He examined and treated the Appellant prior to the crime. Dr. Patton testified that alcohol could possibly enhance the likelihood of a seizure at a given time. His testimony with regard to the Appellant's being in a fight was similar, adding that there was no way of knowing. The Doctor indicated psychomotor epileptics do not recall what occurs during their seizures. Most importantly, Dr. Patton testified that the Appellant had no memory of what he did during his seizures.

"Dr. John Richard Cranton, a thirty-seven year old psychiatrist, examined and treated the Appellant prior to the killing. He indicated that a fight could possibly trigger a seizure. Dr. Cranton's case history indicated a considerable criminal history not connected with the Appellant's condition. This history included theft, confidence rackets, and violence. The Appellant according to the Doctor

had been physically abusive of people while in his seizures, but he did not remember it. Doctor Cranton stated that there was no way of telling whether the Appellant experienced a seizure incident to the crime, but that in attempting to make a judgment on that he would rely heavily on the observations of witnesses."

The state, over objections of appellant, offered the arresting officer in rebuttal. This officer testified that after advising the appellant of his constitutional rights, he completed his oral statement in about twenty minutes; that appellant talked rationally and appeared to be perfectly normal.

Appellant alleges three errors in the trial of this case that should work a reversal.

1.  It is error to admit a statement made by a defendant who is incapable of understanding his actions.

2.  It is error to refuse to give a properly requested written charge on insanity when such is not clearly covered by the court's oral charge.

3.  It is error for the court to overrule an objection to improper remarks by the district attorney relating to the defendant's failure to take the stand or to his mental condition when his plea is not guilty by reason of insanity.

■ The appellate courts of this state have on numerous occasions spelled out the law governing insanity and have consistently adhered to the rule announced in *Parsons* case. In Hall v. State, 248 Ala. 33, 26 So.2d 566, the Supreme Court said:

"We prefer to adhere to the rule announced in the Parsons case [Parsons v. State], 81 Ala. 577, 2 So. 854, 60 Am. Rep. recently re-affirmed in Reedy v. State, 246 Ala. 363, 20 So.2d 528, which requires in insanity cases that the proof should show, that at the time of the commission of the crime the defendant was afflicted with a diseased mind to the ex-

tent: (1) He did not know right from wrong as applied to the particular act in question, or (2) if he did have such knowledge, he nevertheless, by reason of the duress of such mental disease had so far lost the power to select the right and to avoid doing the act in question as that his free agency was at the time destroyed, and (3) that, at the same time, the crime was so connected with such mental disease, in the relation of cause and effect, as to have been the product of it solely."

All three experts were in agreement that appellant has psychomotor epilepsy and that he was subject to seizures and fits. They said a person during such seizure would have no control over his actions and would have complete amnesia during such episode. The psychologist, who did not see or interview appellant until about three months after the homicide, was the only witness to venture an opinion that appellant had a seizure at the time he stomped Murphy to death and that he did not know right from wrong at that time. He further testified that appellant did not know right from wrong at the time he executed the waiver of rights form and at the time he signed the confession.

The neurologist and psychiatrist who treated appellant three years before the killing were much more conservative in approaching the issue. They simply could not say that appellant was in a seizure at the time of the killing, and of necessity, a valid judgment would depend on the observations of eye-witnesses.

The record is totally bereft of eye-witnesses' testimonies as to appellant's conduct and actions during the homicide except his own confession. He did not tell the officers he experienced a seizure at that time or that he had ever had a seizure. The whole matter was an afterthought.

■ The defense of not guilty by reason of insanity must be "clearly proved to the reasonable satisfaction of the jury" and

the burden is on the defendant to do so. Title 15, Section 422, Code of Alabama 1940; Smarr v. State, 260 Ala. 30, 68 So. 2d 6; Lakey v. State, 258 Ala. 116, 61 So. 2d 117.

■ The rule is well-settled that opinion evidence of medical experts, though uncontradicted, is not sufficient to take the question of insanity from the jury, but must be weighed like other evidence. It is within the province of the jury to reject such evidence in toto. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533; Carr v. State, 43 Ala.App. 642, 198 So.2d 791; Luster v. State, 45 Ala.App. 19, 221 So.2d 695.

■ There was no error in admitting the testimony of the arresting officer that within thirty minutes after the killing appellant was calm, appeared to be normal and talked rationally.

■ In Hunt v. State, 248 Ala. 217, 27 So.2d 186, the Supreme Court said:

"A non-expert witness may deny generally the existence of any fact showing an abnormal or unnatural state of mind, without specifying any of such facts. Ford v. State, 71 Ala. 385(8); Parrish v. State, 139 Ala. 16, 43, 36 So. 1012; George v. State, 240 Ala. 632, 636(6), 200 So. 602 and cases there cited. In those cases the witness was then asked to express his opinion whether the party was sane. But such opinion is not necessary to the legality of his testimony that he saw no fact or circumstance showing an abnormal or unnatural state of mind."

■ Appellant's charge No. 6 (without considering vel non its correctness) was refused without error in that the principle sought to be stated therein was fairly and substantially covered by the court's oral charge to the jury. Title 7, Section 273, Code of Alabama 1940; Higginbotham v. State, 262 Ala. 236, 78 So.2d 637; Dobbins v. State, 274 Ala. 524, 149 So.2d 814.

■ Appellant's last insistence of error relates to the argument of the district at-

torney wherein it is claimed reference was made to the failure of the defendant to take the witness stand.

From the record:

"Mr. Holloway: You heard the evidence, but there is no perfect way of showing you what happened. There is no video Tape or instant replay or anything we can do to show you what happened. That has to be based on witnesses.

"Mr. Sigler: I object to him arguing on the lines he's arguing. It violates the Fifth Amendment of the Constitution.

"The Court: I can't hear you.

"Mr. Sigler: That part about someone being present or witnesses that were there.

"The Court: Overrule the objection.

"Mr. Holloway: Judge, for the record, I want to ask the Reporter to read it back at this time, and for the record, I would ask that your Honor instruct the Reporter to insert that portion of the argument in the record, wherein I stated that the doctors were not there, that we don't have a movie.

"The Court: All right; insert that in the record."

We do not construe the above argument of the district attorney to be a comment on the failure of the defendant to testify. To so hold would do violence to the language of the argument itself.

In Diamond v. State, 49 Ala.App. 68, 268 So.2d 850, we said:

"The remark of the District Attorney was not one that the jury would understand to be a comment on the appellant's failure to testify. It is the directing of the minds of the jurors to the fact that a defendant *has failed* to testify that the harm is done. This was an incident of the trial and not intended and could not be construed by the jury as criticizing or commenting upon the defendant's subse-

quent failure to testify. While we do not approve of the remark, we do not think it is equivalent to a comment or a reference prejudicial to appellant."

By no stretch of the imagination could the argument of the prosecutor in this case be construed to be a *direct* comment on the appellant's failure to take the stand.

The foregoing are the matters discussed in brief for appellant, and we find no reversible error in them. We have also considered the entire record, and find it free from error to reverse.

The judgment is affirmed.

Affirmed.

All the Judges concur.