Murder, first degree; life.
 I
The State filed a motion to strike the entire record and dismiss the appeal based on an alleged late filing of the record.
The record indicates that on August 5, 1975, judgment was rendered and a notice of appeal was given. On September 3, 1975, the motion for a new trial was filed and a hearing held. After the expiration of four thirty-day continuances, ranging from October 2, 1975 to January 2, 1976, the record on appeal was filed with this court on May 28, 1976. In a supplemental record filed with this court on June 18, 1976, there was an order dated June 16, 1976, denying the motion for a new trial. The order also stated that the motion was taken under advisement by the trial court on February 2, 1976. Basically, the State maintained there should have been continuances for the motion for the new trial until there was a ruling on it. The State contends, the beginning of the running of time for filing the transcript was the date from the notice of *Page 794 
appeal and not the time of the ruling on the motion.
The rule outlined in Holman v. Baker, 277 Ala. 310,169 So.2d 429, is that the taking of the motion under advisement operates to keep the motion alive and the matter rests in the breast of the court until a judgment on the motion is rendered.
In following this rule, the motion for a new trial would have continued to be alive in the breast of the court for the duration of the period that the court was considering the matter so that the time for filing the transcript with this court would have been computed from the date the court denied the motion for a new trial.
 II
On Friday, March 8, 1975, Gladys Goldsmith left her home in New York and came to Montgomery to attend the funeral of her brother. She was accompanied by her brother, J.D. Morris and his friend, Debbie Foster. On their arrival, they went to the St. Francis Motel where they spent the night with her brother and Foster occupying one room and Gladys Goldsmith occupying another, alone.
Sometime in the early morning hours of Saturday, March 9, Gladys Goldsmith gave birth to a male child. She was alone at the time and according to her statement to the police, she blacked out after giving birth to the baby. In her statement, she related that she left the child on the bed until after 1:00 P.M. and then after inserting the baby in a paper bag, placed it in a suitcase. Subsequently, she dressed and after they placed the luggage in the car, they drove to her mother's house at 3428 Homeview Street in Montgomery, where the suitcase was placed in a bedroom. They then left and attended her brother's funeral in Autauga County.
Ada Mae Thomas testified that she was the appellant's aunt and was present at the Homeview Street address on the day in question. She stated that Elaine Morris told her that she had heard a baby crying in a suitcase. Thomas went to the back room and picked up the suitcase and laid it down. She stated that: "There was something moving in there that I could hear . . . like some kind of whine. . . . Whine, going on, you know, like they were smothering." Thomas said she did not open the suitcase but called her eight-year-old nephew, Bruce Morris, to open it. In the suitcase she saw a baby in a brown paper sack along with some dirt and a green pants suit. The baby was alive and according to some witnesses, there was blood on the child and the sack. According to Elaine Morris it was around 2:00 P.M. when they discovered the baby in the suitcase. Various other witnesses testified that they saw the baby during that time and that it was having difficulty in breathing.
Roberta Minor was present when the baby was discovered and stated that she had seen the appellant wearing the green pants suit found in the suitcase.
None of the witnesses had any knowledge of the appellant's pregnancy.
Shortly after the discovery, the police were summoned and in ten or twenty minutes they arrived and the baby was taken to St. Margaret's Hospital.
Subsequently, the appellant returned to her mother's house after the funeral and when she made her identity known to the police, she was taken to the Youth Aid Division of the police department for questioning. There she was informed that she was charged with assault with intent to murder and questioned about the baby. After signing a form waiving her "Miranda rights," she gave a statement which she signed.
On the morning of March 10, 1975, the baby died. Dr. Keith Hester was the pathologist at St. Margaret's Hospital, who performed the autopsy. According to Dr. Hester, the cause of death was "adrenal hemorrhages" and in addition, "there was pulmonary edema, some hemorrhage into the lungs and failure of complete expansion of the lungs." The doctor said that the adrenal hemorrhage was due to shock and indicated that it caused the baby's death. *Page 795 
He said the shock was due to the baby not being cleaned or having his air passages cleared and from not being kept warm. Dr. Hester testified that he knew nothing about the baby except what was on the hospital chart and that his only encounter with it was during the autopsy. On cross-examination Dr. Hester stated there was no indication of strangulation, bruises or anything that would indicate physical mistreatment.
At the completion of Dr. Hester's testimony, the State rested its case and the defense called Dr. Thomas Nolin, after its motion to exclude was overruled.
Dr. Nolin's specialty was pediatrics. He testified that the baby came in during the early afternoon of March 9, 1975, about 3:00 P.M. Dr. Nolin said that in his very brief examination of the baby, he pulled the blanket from it and determined the baby had been carried a full term of pregnancy. It was active and still covered with the "usual body juices." Further, he said that the umbilical cord was nice and clean but that the child seemed cold. He also stated that the baby was very active and alert and seemed to be slightly larger than an average baby. Dr. Nolin said that except for being cold, the baby was normal. He acknowledged writing a summary of the baby's case for the hospital records. In that discharge summary, he referred to a possible coagulation deficit that could have caused or been a contributing factor in the baby's death. According to Dr. Nolin: "The fact that the baby had unusually prolonged bleeding at the sight of the puncture done on its heel, for routine blood work and blood sugar," supported his ". . . finding as far as clotting deficiency." The doctor added that he did not give the baby a thorough physical because he thought the most urgent thing was to get it warm.
The defense next called Dr. Charles Harold Smith, a physician practicing psychiatry in Montgomery, Alabama. He testified that he had seen the appellant, Gladys Goldsmith, on March 28 and again on March 31, 1975. The meetings were in his office and were for about an hour each. Dr. Smith stated that it was his impression that, at the time of the original interview, the appellant was suffering from extreme depression which was very close to becoming a psychotic depression. Further, at the time he saw her on March 28 she was not legally insane and was able to distinguish right from wrong. Dr. Smith could not say with medical certainty that appellant was psychotic at the time of the incident, but did say that there was better than a "50/50" chance that she was.
On the second day of the trial, Gladys Goldsmith was called to testify in her own behalf. She stated that she worked for a senior citizen's home in New York where she had lived for nine years. Appellant said that she was married and the mother of four children. She stated that she had had health problems and was being treated for extreme anemia. Goldsmith recalled watching the television on the night of March 8, 1975 until the end of the broadcast. She stated that she then went to sleep and did not remember anything until the next day about 12:30 P.M. when Debbie Foster awakened her. Appellant stated that Foster did not come into the room but only inquired whether she wanted breakfast. Afterwards she dressed and when the luggage was placed in the car, they drove to her mother's house. Goldsmith stated that on returning from the funeral, she was taken downtown by the police. She remembered signing a statement but did not remember what she said.
Appellant testified that upon coming to Montgomery she did not know about her pregnancy but said she could have been pregnant. She did not remember giving birth to the child in the motel but added, had she not wanted the child, she could have received a legal abortion in New York. Goldsmith explained that she worked for the county and that her job would have paid for it.
On cross-examination, she admitted signing the statement and talking to the police. However, on further questioning, she denied remembering what was said in the statement or anything concerning the baby's birth. *Page 796 
 III
Counsel contends that the statement given by appellant should not have been admitted into evidence. He maintains: ". . . that in her exhausted mental and physical condition together with the emotional strain of the funeral of a brother . . . and the police questioning, Gladys Goldsmith was not competent to judge whether or not she should waive her rights provided by law."
Before the confession was admitted into evidence, the court held a hearing out of the presence of the jury and Officer Janice Jones testified that the appellant had executed a waiver of rights form which contained the "Miranda Rights." The officer stated that the rights form was read to the appellant and that she had signed the form in the officer's presence. Further, Officer Jones stated that she did not threaten, harass or intimidate appellant in any way, or did she promise her any hope of reward to get her to sign the form.
Officer Billingsly testified that he was present when Officer Janice Jones advised the appellant of her rights and he too said that the statement was not the product of any coercion. He explained that at the time the statement was taken, appellant was charged with assault with intent to murder and the statement was taken the night before the child's death. Further, he said that after the child's death the appellant was charged with murder and executed another waiver form. He added that the statement in evidence was given after the first rights form was executed and before the child's death. The pertinent part of that statement which was given in response to questions was:
. . . . .
 "`I, Gladys Goldsmith, do give the following statement to Officer D.E. Billingsly of the Montgomery Police Department of my own free will.
 "`There have been no threats or promises made, and I have been advised of my rights and understand them.'
"Q What is your name, age and address?
"A Gladys Goldsmith, Age 33, 3428 Homeview.
"Q How long have you been in Montgomery?
"A Got here Friday morning at 6:30 A.M.
"Q Why did you come to Montgomery from New York?
"A To my brother's funeral.
"Q How did you get to Montgomery and who with?
 "A I came on a plane with Debbie and my brother, James Washington and a girl friend.
"Q What is your brother's name, and Debbie's name?
"A Debbie Foster and J.D. Morris.
"Q Where did you stay while you were in Montgomery?
"A St. Francis Motel.
"Q Who rented the room at the motel? "A My brother.
"Q Did you stay in the same room with your brother?
 "A No, I was in a room by myself. "Q While you were in the room, did you have a baby?
"A Yeah.
 "Q What part of the room were you in when you had the baby?
"A I was on the bed.
"Q What time of day did you have this child?
"A I don't know, it was after 12 midnight.
 "Q Was anyone else in the room when the child was born?
 "A Not as I know of, I blacked out. "Q What did you do with the child after it was born?
 "A When I came to it was on the bed, and I just let it lay there.
"Q When did you move the child?
"A I left the child on the bed until after 1:00 P.M.
"Q What did you do with the child after 1:00 P.M.?
 "A It was on a towel and I put it in a paper bag, I didn't look at it and I put it in a suitcase. *Page 797 
"Q What did you do with the suitcase?
 "A I took it to Homeview Street and put it in a bedroom.
"Q Did you clean the baby after it was born?
"A I don't remember.
 "Q Who else knew that you were going to have the baby?
"A Nobody.
 "Q Did anyone come into the room at the motel when the child was there?
 "A No. Debbie stuck her head in the door but she didn't come into the room.
 "Q Did anyone see the baby or you when the child was born?
"A No.
 "Q Did your brother come into the room after the child was born?
"A No.
 "Q What color was the suitcase that you put the child in?
"A It was green with blue flowers on it.
"Q Was this your suitcase?
"A No; it was not mine. I borrowed it in New York.
 "Q How did you get from the motel to your mother's house?
"A My brother had a friend's car.
"Q Why did you do this to this child?
 "A I don't know. I guess I was out of my mind or upset over my brother.
"Q Do you have any other children?
"A Yes, four.
"Q What were you going to do with this child?
"A I don't know.
"Q Why did you leave it at your mother's?
"A I don't know.
"Q Have you seen a doctor or want to see one?
"A No.
 "Q Again, did anyone know about the baby or see it during this time?
"A No; as I know of.
"Q What is the purpose of the dirt in the suitcase?
 "A It is called sour dirt, and I was taking it back to New York with me. I eat it.
"Q Were you going to take the child back to New York?
"A I don't know.
"Q Did you intend to kill this child or let it die?
"A No; I was going to tell my mother about it.
 "Q Is there anything you would like to add to this statement?
"A No."
After the hearing, out of the presence of the jury, the trial judge found that the confession was voluntarily made. This court has held that great weight must be given to his judgment and only upon a finding that his decision is palpably contrary to the weight of the evidence, will his finding be disturbed.Jackson v. State, 51 Ala. App. 263, 284 So.2d 289. In Goldin v.State, 271 Ala. 678, 127 So.2d 375, the Supreme Court of Alabama stated:
 ". . . The fact that an accused is not in full possession of his or her mental faculties when the confession is made does not render it inadmissible, but only affects the weight to be accorded by the jury; or is provable merely to support other evidence that the confession was not voluntary. To render such a confession inadmissible on that ground the mania must have been such that the accused was either an idiot or a lunatic during lunacy." [Citation omitted.]
In Elrod v. State, 281 Ala. 331, 202 So.2d 539, the Supreme Court observed:
 ". . . Evidence tending to show a defendant's weak mentality, feeblemindedness, and mental stress does not affect the admissibility of the confessions, but rather is a matter that bears on the weight, credibility and effect to be given the confessions by the jury." [Citation omitted.]
In our judgment there was a full compliance with Miranda v.Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and there was no error in admitting appellant's *Page 798 
statement in evidence. Barnett v. State, 51 Ala. App. 470,286 So.2d 876.
 IV
Appellant next argues that the verdict of the jury was contrary to the evidence in the case. He maintains: (1) that the evidence did not prove that Gladys Goldsmith caused the death of the child; and (2) that appellant's actions were not deliberate, premeditated or malicious.
Judge Harris, writing for the majority of this court inAlbright v. State, 50 Ala. App. 480, 280 So.2d 186, which was reversed because of a defective indictment, made the following observations:
 ". . . The law of neglect or omission as the same relates to infant children comes to us from the ancient common law being grounded upon a status relationship of paternal support, care, protection and nurture. An obligation imposed by law carries with it the corresponding legal duty to meet and discharge the responsibility. Willfully allowing one to be exposed to conditions which will probably result in death, where there is a duty to protect such person, constitutes murder. To create criminal responsibility for death resulting from exposure, there must be neglect to perform a legal or contractual duty which accused was bound to perform." [Citation omitted.]
Further, Judge Harris quoted from Regina v. Hughes, 7 Cox C.C. 301, p. 302, wherein Lord Campbell, C.J., said:
 "`But it has never been doubted that if death is the directed [sic] consequence of the malicious omission of the performance of a duty (as of a mother to nourish her infant child) this is a case of murder. If the omission was not malicious and arose from negligence only, it is a case of manslaughter.'"
Noteworthy also is 1 Wharton's Crim. Law, 12 ed. § 485, which states:
 ". . . it may be generally stated that for a parent, having special charge of an infant child, so culpably to neglect it that death ensues as a consequence of such neglect, is manslaughter if death or grievous bodily harm were not intended; and murder if there was an intent to inflict death or grievous bodily harm." [Footnote omitted.]
In Alabama the guilty agency component of corpus delicti may be established by circumstantial evidence. Smith v. State,54 Ala. App. 237, 307 So.2d 47; Clark v. State, 54 Ala. App. 217,307 So.2d 28.
The testimony summarized above shows that Goldsmith gave birth to a child and at no time did she give aid to the helpless infant. In fact, the evidence shows that sometime after delivering the child, she "put" it into a paper bag which was placed into a suitcase that was subsequently closed. These are facts from which a jury could determine that the infant's death was the direct result of Goldsmith's intentional acts.
The testimony of Dr. Hester, the pathologist, and the lay witnesses, showed facts from which a jury could infer that Goldsmith's willful omissions in not caring for the infant, resulted in the exposure that caused its death. The sufficiency of this proof was for the jury and not for the court. Hearns v.State, 47 Ala. App. 725, 261 So.2d 64; Potter v. State,44 Ala. App. 376, 209 So.2d 856; Cook v. State, 43 Ala. App. 304,189 So.2d 595.
The second prong of this insistence, that Gladys Goldsmith at the time of these acts was psychotic was a question for the jury and the responsibility for such proof was on the appellant. Breen v. State, 53 Ala. App. 588, 302 So.2d 562;Lester v. State, 270 Ala. 631, 121 So.2d 110. The only evidence presented by defense in support of her plea of not guilty by reason of insanity came from Dr. Smith. He testified that he had examined appellant after her arrest on two occasions, each lasting one hour. Dr. Smith determined that she had a transient psychosis and there was a "50/50 chance that she had slipped into a psychotic state at the time the infant was placed in the suitcase. Although this evidence was uncontradicted, it in and of itself, was not sufficient to remove the question of *Page 799 
insanity from the jury. It was within the province of the jury to accept or reject such expert testimony. Hockenberry v.State, 246 Ala. 369, 20 So.2d 533; Carr v. State, 43 Ala. App. 642, 198 So.2d 791; Luster v. State, 45 Ala. App. 19,221 So.2d 695; George v. State, 240 Ala. 632, 200 So. 602; Cunningham v.State, 47 Ala. App. 730, 261 So.2d 69.
After considering all the evidence presented, we conclude that it was sufficient to support the verdict under the rule inBridges v. State, 284 Ala. 412, 225 So.2d 821.
 V
The appellant complains that reversible error was committed when several State witnesses were allowed to testify, even though they had remained in the court room during opening statements to the jury. In overruling this objection, the court stated it was basing its ruling on the fact that no witness had taken the stand and nothing but the statement of the case had been presented to the jury. In view of the fact that no showing was made of any injury to the appellant as a result of the witnesses' presence during the opening statements, we are of the opinion the court's actions were not error. Page v. State,57 Ala. App. 265, 327 So.2d 760.
Whether these witnesses should have been permitted to testify was within the discretion of the trial judge. Under the circumstances, we find no abuse of discretion. McMurtrey v.State, 39 Ala. App. 319, 101 So.2d 88.
We have searched the record and did not find any error.
AFFIRMED.
All the Judges concur.