The appellant was convicted of first degree murder and sentenced to life imprisonment in the penitentiary. He was represented by court-appointed counsel and at arraignment pleaded not guilty and not guilty by reason of insanity. After sentence was imposed, appellant gave notice of appeal and was furnished a free transcript. Trial counsel was appointed to represent appellant on this appeal.
On the morning of July 24, 1978, Aaron Lockhart, a letter carrier for the United States Postal Service, attempted to deliver mail at 2333 10th Avenue South, Birmingham, Alabama. As he approached the house he discovered the body of Charles Erwin Barnes lying on the edge of the sidewalk.
Birmingham Police Officer Linda J. Graham was dispatched to 2333 10th Avenue South on the morning of July 24, 1978. She observed, on the body of the deceased, wounds in the shoulder and chest area. She also observed a van parked behind the house. She discovered a lady's handbag in the van and blood by the driver's door window. Officer Graham also discovered drops of blood trailing from the body along the walkway and bushes leading back to the van.
Deputy Coroner C.C. Robey[1] of the Jefferson County Coroner — Medical Examiner's Office took charge of the body at the scene of the crime. Chief Coroner Dr. Ronald Rivers performed an autopsy on the deceased on July 24, 1978. There were two stab wounds to the chest and numerous scratches and bruises over the head and upper extremities. Death was caused by shock and hemorrhage due to a perforated wound to the heart.
Nellie McConnell testified that the deceased drove her, her husband, Steve, and the appellant to the airport on the morning of July 24, 1978. Mrs. McConnell's husband was leaving for a tour of duty in the military service. After leaving Steve McConnell at the airport the other three returned to Mrs. McConnell's apartment at 2333 10th Avenue South.
Upon arriving at the apartment the three of them sat in the deceased's van in the yard. The appellant and Mrs. McConnell became involved in an argument. The appellant *Page 1170 
stepped out of the van and walked in the direction of his automobile. He returned shortly to Mrs. McConnell at the passenger side of the van. The appellant "fell across" Mrs. McConnell and stabbed the deceased in the chest area twice. The appellant grabbed Mrs. McConnell, told her, "You are going with me, bitch," dragged her across the yard and put her in his automobile while she was screaming.
The appellant took Mrs. McConnell to Tennessee, told her the deceased was dead, and that she would get some of the same if she didn't "hush." Mrs. McConnell talked appellant into throwing the knife he stabbed the deceased with away because she was afraid he would use it on her. He threw the knife in the Tennessee River.
Mrs. McConnell talked the appellant into taking her back home by telling him she would marry him. Upon arriving in Birmingham the appellant went to the courthouse to see if there was a warrant out for his arrest. There was none. They then went to Shoney's where she called her parents.
On cross-examination, Mrs. McConnell revealed that the appellant had moved in with her and her husband on July 3, 1978. She had sex with the appellant on that date. She also had sex with him on July 24, 1978. There was no force involved either time. She stated that the appellant and the deceased had never argued and there was no struggle. The deceased was not armed and did not say a word to appellant prior to the stabbing.
It cannot be gainsaid that this witness was a woman of questionable character and her credibility left much to be desired. However, her credibility was for the jury to determine.
Detective Sergeant Charles M. Melton of the Birmingham Police was the chief investigator for this case. During Sergeant Melton's testimony the jury was removed from the courtroom and a hearing was held on the appellant's motion to suppress his statement given to Sergeant Melton. The testimony during the suppression hearing of Sergeant Melton and Sergeant Morgan Knight of the Birmingham Police was to the effect that the appellant was advised of his Miranda[2] rights and that no threats, promises, rewards or other inducements were made to get appellant to give a statement. The appellant voluntarily turned himself in to the police.
Clayton Shealy, a clinical psychology intern at the University of Alabama Medical School, was called as a witness for the appellant at the suppression hearing. He testified he administered several tests to the appellant and conferred with his supervisor, Dr. Allen Shealy (no relation), about the results. He testified the appellant was put under hypnosis by Dr. Jack Anderson. Mr. Shealy's opinion was that the appellant understood the Miranda rights but lacked the capacity to understand the consequences of his statement. Tests also showed the appellant to be of superior intelligence.
Dr. Thomas L. Smith, a psychiatrist, was called by the State. He testified the appellant possessed superior intelligence and understood the consequences of the Miranda rights. At this point the trial court held the appellant's statement to be voluntary.
The testimony of Sergeant Melton then resumed before the jury. The voluntariness predicate was laid and by agreement the tape recording of the appellant's statement was played before the jury and was admitted into evidence along with the typewritten transcript of the statement. The appellant admitted his guilt in the statement.
The State then rested its case. The trial court denied the appellant's motion to exclude the evidence.
Clayton Shealy was called as the first witness for the defense. His testimony was essentially the same as at the suppression hearing. He testified the appellant was suffering from a mental defect known as hysterical neurosis, dissociative type. His opinion was that the appellant did not know *Page 1171 
the difference between right and wrong at the time of the incident.
Dr. Allen Shealy testified he was a psychologist specializing in forensic and clinical psychology. He supervised Clayton Shealy's evaluation of the appellant and concurred with Clayton Shealy's findings.
Dr. Jack Robert Anderson, a psychiatrist, hypnotized the appellant. He determined the appellant was highly suggestible. He testified there was not enough information to determine whether the appellant knew right from wrong.
The defense rested its case and the State called as a rebuttal witness Dr. Thomas L. Smith, a psychiatrist and lawyer. He examined the appellant at the Bryce Forensic Unit and determined that the appellant was competent to stand trial and was sane at the time of the offense. He found no evidence of mental disease. Dr. Smith determined the appellant had a superior IQ and understood the Miranda warnings. He said appellant's IQ was in the range above 120.
The State then called Dr. James C. Thompson, a staff psychiatrist at Bryce Hospital. His testimony concurred with the opinion of Dr. Smith.
The last rebuttal witness for the State was Edwin Conrad Seger, a clinical psychologist for the forensic program at Bryce Hospital. He testified the appellant knew the difference between right and wrong.
The defense called as rebuttal witness two employees of Shoney's who testified that the appellant and Mrs. McConnell came in Shoney's on July 25, 1978. The defense then rested.
During the prosecution's examination of the State's expert witness, Dr. Thomas L. Smith, a consultant with the Forensic Unit of Bryce Hospital, the following occurred:
"REDIRECT EXAMINATION
BY MR. JOHNSON
 "Q. Doctor, Mr. Jaffe asked you could someone be smart and crazy. Do you think at the time of this alleged incident this defendant was smart and crazy?
 "A. No, I don't think he was insane. I didn't see any evidence of insanity.
 "Q. Now, you work with the Forensic Unit and you all didn't get this defendant until February of this year. Do you all have a certain number of patients you can take at one time?
"A. Yes.
"Q. What is that?
"A. Approximately forty four.
 "Q. Would you, if you were in the position there at Bryce, make a determination if this defendant was committed to Bryce, to keep him there — would you keep him there?
"A. No.
 "MR. JAFFE: We object to that and move for a mistrial based on that. That's totally prejudicial.
 "THE COURT: Overruled and I'm putting an end to your examination of this witness. Mr. Johnson. You two gentlemen are going to continue. Do you need Dr. Smith for any further examination?
 "MR. JAFFE: If Your Honor, please, we would like for the Jury to be polled as to that question.
 "THE COURT: Disregard that last question by the District Attorney, ladies and gentlemen. Is there any of you who cannot disregard it? I presume by your silence that you can."
The appellant contends "the state's attorney poisoned the minds of the jury by conveying the fact that a mental hospital might not keep the Defendant regardless of what decision the jury reached regarding his sanity." The record does not support appellant's contention.
Alabama law allows broad inquiry of expert witnesses as to the sanity of a defendant on a plea of not guilty by reason of insanity. Stinson v. State, 45 Ala. App. 5, 221 So.2d 397, cert. denied, 284 Ala. 734, 221 So.2d 399 (1969); Fitzhugh v. State,35 Ala. App. 18, 43 So.2d 831, cert. denied, 253 Ala. 246,43 So.2d 839 (1949); Gamble, McElroy's Alabama Evidence, § 61.01 (7) (3rd Ed. 1977). Dr. Smith was called by the State in rebuttal to testimony of defense experts that the appellant was insane. Dr. Smith, after being duly qualified, testified *Page 1172 
extensively as to the appellant being sane at the time of the offense and competent to stand trial. The question and answer challenged by the appellant was consistent with Dr. Smith's earlier testimony. This was just another way of stating that Dr. Smith's opinion was that appellant was sane at the time of the homicide and the trial.
Dr. Smith testified that his duty as consultant to the Forensic Unit at Bryce Hospital was to examine the mental status of patients involuntarily committed to Bryce Hospital. Dr. Smith's connection to Bryce Hospital was made clear. It stands to reason that if Dr. Smith has determined the appellant to be sane he certainly would not commit appellant to Bryce Hospital.
We do not believe the three main cases[3] cited by the appellant to support his proposition are analogous to the instant case. These cases concerned the cumulative effect of repeated prejudicial remarks made by the prosecutors in closing arguments. The cumulative effect of the remarks in those cases was so grossly unfair as to not even require that there be an objection made to the comments. There were no repeated prejudicial remarks in the instant case.
We note that the objection in this instance came after the question had been answered. There was no motion to exclude requested. This alone amounts to a waiver. Burton v. State, Ala.Cr.App., 364 So.2d 394, cert. denied, Ala., 364 So.2d 397
(1978). The appellant's request to poll the jury does not amount to a motion to exclude. In response to the appellant's request to poll the jury the trial court sua sponte instructed the jury to disregard the challenged question.
During the prosecution's recross examination of the defense expert witness, Clayton Shealy, the following occurred:
"Q. Are you a student of the Bible?
"A. Excuse me?
"Q. Are you —
"MR. JAFFE: Object to that, Judge.
"THE COURT: Overruled.
 "MR. JAFFE: We respectfully except to that question as being irrelevant, and immaterial.
"THE COURT: I have already ruled, Mr. Jaffe.
"MR. JAFFE: Can I state my grounds, Judge?
 "THE COURT: I have already ruled. Go ahead with your question, Mr. Johnson.
 "Q. The question, I think, was are you a student of the Bible?
"A. Does that mean do I study the Bible?
"Q. Yes.
"A. No, I don't.
"Q. Are you a member of some denomination?
"A. Yes, I am.
"MR. JAFFE: We would object, same grounds.
"THE COURT: Overruled.
"Q. What is that denomination?
"A. Lutheran denomination.
"MR. JAFFE: Same objection.
"THE COURT: Overruled.
 "Q. This defendant, is he a member — do you know whether he is a member of any denomination?
"A. No, I don't.
"Q. Do you know whether he studies the Bible?
 "A. I know that recently he has been studying the Bible.
"Q. He has been studying the Bible recently?
"A. Yes.
 "Q. Is anything in the Bible about having children that you know about?
"MR. JAFFE: Same objection, same grounds.
 "THE COURT: Sustained. I think you are going too far afield, now, Mr. Johnson.
 "MR. JAFFE: Respectfully move for a mistrial at this time.
"THE COURT: Overruled." *Page 1173 
The appellant contends the prosecution's examination of Mr. Shealy constituted improper and prejudicial impeachment of a witness and was in violation of § 3 of the Alabama Constitution of 1901. The pertinent part of § 3 of the Alabama Constitution provides as follows:
 "[T]hat no religious test shall be required as a qualification to any office or public trust under this state; and that the civil rights, privileges, and capacities of any citizen shall not be in any manner affected by his religious principles."
(Emphasis added.)
In the case of Wright v. State, 24 Ala. App. 378, 135 So. 636
(1931), our Court of Appeals held that § 3 of the Alabama Constitution of 1901 completely abrogates the common law rule that one who disbelieves or denies the existence of God or a Supreme Being is not a competent witness in any court of this state, where an oath is required. In reaching this decision the court quoted extensively from Bush v. Commonwealth, 80 Ky. 244, 3 Ky.Law Rep. 740, rev. on other grounds, 107 U.S. 110,1 S.Ct. 625, 27 L.Ed. 354 (1882). Bush, in construing a constitutional provision essentially the same as our § 3, held that, "We think that this provision of the constitution not only permits persons to testify without regard to religious belief or disbelief, but that it was intended to prevent any inquiry intothat belief for the purpose of affecting credibility."
(Emphasis added.) 135 So. at 639. Our court specifically declined to adopt the underlined portion of the above quote although the court stated "they may be right about that." 135 So. at 639.
We interpret Wright as standing for the proposition that a witness's religious belief may not be inquired into unless it is relevant to the issues at trial. "The determination of relevancy in a criminal trial rests largely within the trial court's sound discretion . . . `Relevancy has a broad scope in criminal trials.'" Strickland v. State, Ala.Cr.App.,348 So.2d 1105, cert. denied, Ala., 348 So.2d 1113 (1977). "[T]he exclusionary rule will not be applied to bar evidence that is relevant to an issue in the case, even though it may relate to religious practices or affiliations on the part of the witness or to some other aspect of his theological training or experience." 76 A.L.R.3d 539, 544 (1977).
Prior to the prosecution's examination of Mr. Shealy on the religious issue, on redirect examination of Clayton Shealy by the defense attorney, the following occurred:
"Q. What else did he tell you?
 "A. He told me that the results of this crime or results of this trial here were left in the hands of Jehovah God Almighty.
 "Q. What did you ask him about Jehovah God Almighty — what did he say he has relation with Jehovah God Almighty?
 "A. I asked him — this is the first time, well, yesterday was the first time I heard anything about Jehovah God Almighty, so I asked him how is it that all of a sudden this has come about, this relation with Jehovah God Almighty. He said, `Well, since coming back to jail, I have seen and talked to Jehovah God Almighty and I am his son and my life is in his hands in whatever happens.'
"Q. Did he say he is related to anybody else?
"A. No.
 "Q. Did he say he has any brothers — what did he say about Jehovah?
 "A. He said that was his father and that he had talked with him on occasions and had seen him on occasions and that it was his father and his father would take care of him and he had already sentenced him and he would punish him for his offenses."
* * * * * *
 "Q. Did he discuss anything with you today about babies and his father and mother?
 "A. Yes, he reported that Jehovah God Almighty said that every man should have a child and that Jehovah God looked like his father in some respect but that this Jehovah God Almighty does not have any flesh. He also said there was a *Page 1174 
mother Jehovah God Almighty or something to that effect."
. . . . .
 "Q. What is the difference between everybody wanting to have a baby, you and me and all of us here, and the way you see his desire to have a child?
 "A. First of all, I said most people want to have a baby and to have a child. John is different in that he has a craving to have a child and it's almost related to undoing of his parents' death. He has always craved to have a child. The child that his mother never had; the child that Nellie was supposedly carrying that was his and a child that this teenage female that he met in jail is supposed to carry.
 "Q. Is that an obsession that you have a child that you would call this?
"A. Yes."
The defense first injected the issue of religious belief when they referred to the appellant's relationship with "Jehovah God Almighty." The defense went on to reveal appellant's compulsion to father a child. It appears that all of this testimony was brought out for the purpose of implying appellant's insanity. The prosecution's inquiry into the subject cannot be questioned. "A party may go into any matter gone into by the adverse party and explain anything to his detriment. . . . A party who has brought out evidence on a certain subject has no valid complaint as to the action of the trial court in allowing his adversary to introduce evidence on the same subject."Weatherford v. State, Ala.Cr.App., 369 So.2d 863, 869, cert. denied, Ala., 369 So.2d 873 (1979).
We also believe that the prosecution's examination of Mr. Shealy subsequent to the questions objected to by the appellant illustrates that the prosecution was seeking to rebut the implication of insanity introduced on redirect examination. From the record, on recross examination of Clayton Shealy by the prosecution, the following occurred:
 "Q. Have you ever the last few times you have talked with him, have you ever seen him with a Bible?
"A. Yes, I have.
"Q. Is that this yellow book in front of him now?
 "A. I cannot be sure that's the book. It looks like the book I saw him with.
 "Q. Have you in your experience as a — not as a psychologist, but in your experience met people in life you considered to be religious zealots?
"A. Have I known people like that, yes.
"Q. Are they crazy?
"A. Most people that I know like that are not.
 "Q. Have you known people in your life who profess to know the Lord and to know Jehovah God?
"A. Yes, I have.
"Q. Are they crazy?
"A. Like I said, most of them aren't."
We find no error in this instance. Hill v. State, 36 Ala. App. 123, 53 So.2d 766 (1951).
The appellant's last contention of error concerns the colloquy between the trial court and the defense attorney during the defense attorney's cross-examination of Dr. Thomas L. Smith. From the record:
 "Q. I believe that's all — there is one last thing, you testified for the State of Alabama in the Tommy Lee Hines trial.
"MR. JOHNSON: Judge, I'm going to object to that.
"THE COURT: Sustained.
"MR. JOHNSON: And ask for a mistrial.
 "THE COURT: Disregard it, ladies and gentlemen, and if that comes up again, I'm going to hold you in contempt of court, Mr. Jaffe.
"MR. JAFFE: Yes, sir.
"THE COURT: That's highly unethical.
 "MR. JAFFE: Your Honor, could I approach the bench for a second, please, sir?
 "THE COURT: Ladies and gentlemen, please go back to the jury room.
 (Thereupon, the jury went into the jury room at 10:12 AM, and out of the presence and hearing of the jury the following proceedings were had and done:)
"MR. JAFFE: May I respond?
"THE COURT: You may respond. *Page 1175 
 "MR. JAFFE: Judge, I had no intention doing anything except ask him about intelligence quotient. I was told by Dr. Shealy yesterday that Dr. Smith testified that in the Tommy Lee Hines trial —
"THE COURT: It has no bearing on this case.
 "MR. JAFFE: All right, sir, I apologize to the court. It's not going to affect the issues in this case whether he testifies.
 "THE COURT: Well, you are attempting to bring up something that has nothing to do with it and I'll not let this jury get prejudiced in any manner.
 "MR. JAFFE: Well, may I please apologize to the court. I had no intention of that. I am trying to tell you my purpose for it.
 "THE COURT: Well, you are a professional attorney, right?
"MR. JAFFE: I am.
"THE COURT: You are a former prosecutor?
"MR. JAFFE: I am.
"THE COURT: You know what's ethical and nonethical.
 "MR. JAFFE: No, sir, and I did not think that was unethical because you always ask people about trials that they have testified and given opinions in. I have always done that. It's always been done.
 "THE COURT: I don't know what they do in Tuscaloosa County, but you don't do it in Jefferson County.
 "MR. JAFFE: Well, I'll tell you. Let me apologize to Your Honor.
"THE COURT: All right, bring the jury in.
"MR. JOHNSON: Judge, may I have just a minute?
 "MR. JAFFE: I wasn't trying to be unethical. I wish you hadn't said that in front of the jury. I feel like I have been prejudiced by calling me unethical before the jury.
 "THE COURT: Well, both of you are getting on the verge of my declaring a mistrial in this case; if you keep it up I will.
"MR. JAFFE: Yes, sir.
 (Thereupon, the jury returned to the courtroom at 10:15 AM, and the following proceedings were had and done:)
 "THE COURT: Ladies and gentlemen, I want to charge you that you are to disregard any confrontation that occurred prior to the time I sent you back to the jury room. Is there any member of the jury who cannot eradicate that from your mind and proceed in this case on the issues and the issues alone?
(No response)
 "THE COURT: I presume by your silence that you can eradicate it. If there is any member that cannot, let me know at this time.
"THE COURT: There is no response. You may continue."
The appellant contends the trial court erroneously denied his attempt to impeach Dr. Smith by showing prior inconsistent statements of Dr. Smith at the Tommy Lee Hines trial. We find no merit in this contention. There is nothing in the examination of Dr. Smith that leads us to believe he has made any prior inconsistent statements concerning this case. The defense attorney stated to the trial court that expected testimony of Dr. Smith would not affect the issues in this case and admits in his appellate brief that the Tommy Lee Hines case has no bearing on the instant case. We believe the question to be totally irrelevant to the issues.
The appellant also contends the trial court committed reversible error by stating in the presence of the jury that the defense counsel was unethical. The principle of law controlling this type of incident is stated in Dennison v.State, 17 Ala. App. 674, 88 So. 211, 213 (1921):
 "The trial judge, as a natural consequence of his position and the many duties devolving upon him, is necessarily vested with much discretion in the conduct of the trial of causes, and, unless it clearly appears that there has been an abuse of this discretion, appellate courts will not interfere to control such discretion, but will presume that one occupying *Page 1176 
so important a position as that of circuit judge will accord to all litigants in his court the fair and impartial trial provided for in the Constitution of this state. That a trial judge wields a great influence upon the jury cannot be questioned, for it is their duty to follow his instructions as to the law. So, whenever he expresses an opinion on any disputed fact, or of the character of a witness, or compliments one attorney at the expense of another, or uses language which tends to bring an attorney into contempt before the jury, or uses any language or makes any intimation which tends to prejudice them, he commits an error of law, which would, of necessity, effect a reversal of the judgment and a remandment of the cause. In the instant case we are not prepared to say that the alleged injurious language of the court addressed to appellant's counsel was of the character to prejudice the attorney before the jury or to injuriously affect the substantial rights of the defendant. However, we are of the opinion that the trial court should have allowed defendant's counsel full opportunity to make known his objections to the court, and to make such motions to the court as in the interest of his client he deemed necessary. . . ."
We do not believe that the defense attorney's question called for such a stinging rebuke by the trial court even though the question was irrelevant and improper. However, we fail to find an objection to the trial court's statement. The only statement by the defense attorney that might resemble an objection was the statement that he "wish[ed]" the trial court had not called him unethical in the presence of the jury. This last statement by counsel was made out of the presence of the jury. We also fail to find a motion to exclude, a motion for mistrial, or an adverse ruling on this issue. For these reasons we are forbidden to further treat this contention. Dolvin v. State,51 Ala. App. 540, 287 So.2d 250 (1973); Weeks v. State, 49 Ala. App. 618, 274 So.2d 646 (1973). See also: Chambliss v. State, Ala.Cr.App., 373 So.2d 1185, cert. denied, Ala., 373 So.2d 1211
(1979).
The trial court sua sponte instructed the jury to disregard the confrontation between the court and defense attorney and polled the jury on that instruction. Cf.: Lewis v. State,22 Ala. App. 108, 113 So. 88 (1927) (wherein oral charge to jury cured error of court's criticism of counsel.)
The record does not support appellant's contention that prejudicial error was committed by the prosecutor's closing argument to the jury. The conduct of counsel for both sides was calculated to try the patience of the trial judge throughout the entire proceedings but the judge exercised commendable restraint to insure that appellant received a fair and impartial trial.
We have carefully searched the record for error injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur, except BOWEN, J., who concurs in the result only without opinion.
[1] The name is listed in the transcript as both C.C. Robey and Charles B. Robey.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[3] White v. State, Ala.Cr.App., 376 So.2d 1129, cert. denied, Ala., 376 So.2d 1132 (1979); Whisenhant v. State, Ala.Cr.App.,370 So.2d 1080, cert. den., Ala., 370 So.2d 1106 (1979);Christian v. State, Ala., 351 So.2d 623 (1977).